**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John Louis CRANE, Defendant-**
**Appellant.**

**No. 30229.**

United States Court of Appeals,
Fifth Circuit.

June 4, 1971.

Rehearing Denied Aug. 6, 1971.

Frank M. Gleason, Ross L. Hatcher, Rossville, Ga., Joseph E. Loggins, Summerville, Ga., for defendant-appellant.

John W. Stokes, Jr., U. S. Atty., J. Owen Forrester, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

RIVES, Circuit Judge:

The jury found Crane guilty of burglary [1] and larceny [2] from the Post Office at Flintstone, Georgia, and the judge sentenced him to imprisonment for two years under the provisions of 18 U.S.C. § 4208(A)(2).[3] On appeal he contends that the district court erred: (1) in denying his motion for new trial either (a) because the Government suppressed evidence of Dr. Sheldon Wohl or (b) because of newly discovered evidence set forth in the affidavit of Dr. Wohl; (2) in denying his motion to suppress evidence obtained by an alleged illegal search of his garage business; (3) in denying his motion of a mistrial because of improper argument of the Assistant United States Attorney; (4) in denying his motion for a judgment of acquittal. We find no reversible error and therefore affirm. An understanding of the reasons for our decision requires a detailed discussion of the evidence.

Jointly indicted with Crane were three codefendants, Brown, Murphy and Seitz. Brown and Murphy had pleaded guilty and were serving their sentences.[4] Seitz had confessed but had not been tried.[5] The crime was committed in the extreme northern part of Georgia close to the Tennessee line and near Chattanooga. At approximately 5:00 A.M. on September 21, 1969, Captain John Holt of the Sheriff's Department, Hamilton County, Chattanooga, Tennessee, received a telephone call from an unnamed person who asked to speak to Robert E. Cornish, Chief of Detectives. On being advised that Cornish was at his home, the caller left a telephone number.

Cornish promptly returned the call. The informant told him that the Flintstone Post Office had been burglarized, and named three individuals as the burglars, one of whom was Seitz, already well known to Cornish.[6] Cornish then called back to Captain Holt, asked him to check the Flintstone Post Office as to whether it had actually been burglarized, and to send Detective Nelson to the Rossville, Georgia, area where Cornish would meet him.

Captain Holt found the doors of the Post Office open and signs of the safe having been dragged across the floor to a dirt and gravel driveway which bore heavy tire marks. He advised Chief Cornish on the patrol radio.

Meanwhile Cornish had proceeded from his home in Tennessee to Rossville, Georgia. As he drove onto Chickamauga Avenue, he saw a 1963 Plymouth which he knew to be operated by Seitz. He could not then identify the other occu-

---

1. In violation of 18 U.S.C. § 2115.

2. In violation of 18 U.S.C. § 1707.

3. Making him eligible for parole at such time as the board of parole may determine.

4. They were made available to both parties but were not examined as witnesses.

5. He became the Government's star witness against Crane.

6. The record does not show anything about the past reliability of the informant.

pant of the car but later did identify him as Brown. Cornish being afraid to follow the car too closely, it was lost from his view. Shortly thereafter he again saw the car, then following a truck. He followed both the car and the truck. They drove directly to a garage which was later identified as Crane's Garage. The truck turned into one of the bays of the garage. Seitz and Brown parked the Plymouth car, and entered the garage at the same time as the truck. The bay door was then closed.

In the garage door were three horizontally spaced small windows. After parking his car, Cornish walked across to the edge of the garage and looked into the garage through one of the windows. Continuing, Cornish testified:

"Q. All right, did you see anything inside?

"A. Yes, sir. There was the truck in the first bay. They had the doors of the truck open. There was a heavy-set man with bushy hair who was pushing a group of tanks up they normally use for cutting torches and things.

"Q. You mentioned Seitz. Do you know a man named Tommy Seitz?

"A. I do.

"Q. Did you know him previous to this time?

"A. Well; yes, sir.

"Q. Was that man pushing that torch Mr. Seitz?

"A. No; it wasn't, sir. Mr. Seitz has short hair, and this man had quite a bit of hair.

"Q. Do you know where any of the other people in the garage were?

"A. Yes, sir. I could see over on the back side of the garage hear another person getting some—rummaging around in some tools or something there, and at that time I didn't know who he was, but I

could later identify him as Murphy.

"Q. All right. Well, do you know Mr. Brown?

"A. I do now. I didn't at that time. I knew of him. I knew what he looked like, but I did not know a lot about him.

"Q. Was it light or dark in the garage?

"A. Oh, there was no lights on in the garage. There was—the lights were shining, you could see shadows and see people moving around. I doubt very seriously —there wasn't a lot of light, but I could see these individuals easily enough.

\*   \*   \*   \*   \*   \*

"Q. Have you subsequently come to know Mr. Brown?

"A. Yes; I have.

\*   \*   \*   \*   \*   \*

"Q. All right, state whether or not the man dragging that oxygen tank was Mr. Brown.

\*   \*   \*   \*   \*   \*

"A. (By the Witness) The man was a much larger man than Mr. Brown." [7]  (Tr. pp. 44, 45, 46.)

About that time Detective Nelson arrived and took a position to see that no one escaped from the garage building. About the same time, Cornish received over his car radio the report from Captain Holt that, on checking, he found Flintstone Post Office had been burglarized. Cornish then called for the Rossville police and within minutes some of their officers arrived. In quick succession, a magistrate was summoned to the scene, and a telephone call to Crane's home brought his two sons, one 18 and the other 19 years old, with a key to the garage. Before the key was used to enter the garage, "quite a crowd of people" had gathered. Cornish testified that the entry was "after a search warrant had been issued." (Tr. 48)  Similarly,

---

7. The court sustained objection to the witness' conclusionary statement that "I thought it was Mr. Crane."

Captain Holt testified, "After they got the search warrant I went inside the building." (Tr. 35) Cornish signed the affidavit for the warrant. (Tr. 91) Crane's younger son testified that Officer Griffin gave the search warrant to his brother. (Tr. 342) The search warrant was not introduced in evidence. On objection by Crane's counsel that, "if he had a search warrant, we say it would be the highest and best evidence" (Tr. 49), the district court ruled: "The fact he may have made an entry into a building without a search warrant would not, in and of itself, be inadmissible. If I see any authority you can cite to the contrary I will be glad to change my ruling and instruct the jury likewise." (Tr. 50-51)

Seitz and Brown were found inside the truck with the unopened post office safe.[8] Officer Griffin found Crane in the garage bathroom sitting on the commode with its lid closed and bearing some lacerations on his head. Last of all, Murphy was found lying on the floor in a screened in area "where there was a lot of stored tires and what-have-you." (Tr. 52, 53)

## I.

Crane's conviction or acquittal might well turn on the evidence of his physical and mental condition at the time of and shortly after he was discovered in the garage toilet. That is made clear by the evidence on the trial and the affidavits on the motion and amended motion for new trial. Seitz testified that he went with Murphy to Crane's garage for a repair to be made on a car which Murphy had bought from Crane, that Crane "knew we were thieves" (Tr. 139), that

"While we were there getting the dimmer switch put on, John Crane was talking to us about the Flintstone Post

Office and the house across the street from it being empty.

\* \* \* \* \* \*

"And he said that now would be the time to get the safe in it, and he took a piece of paper and wrote down his phone number on it and said, 'Call me when you get it,' and walked in the office and got the key to the big truck out of the cash register and gave us the key to this big GMC, V-6, Cab-over-engine truck with a lift tailgate and all on it, told us to get a key made for it.

"I took the key, and they put the dimmer switch on, about that time they had completed putting it on, and so we left and went and got a key made for it and brought the other key back, gave it to John Crane, and I don't know if he put it back in the cash register or not. I just handed it to him. Anyway, we had a copy of the key made.

"Then the next day we came over there and got the truck and went and stole the safe out of the post office." (Tr. 141, 142)

In his own behalf Crane testified that he had been in the garage business in Rossville, Georgia, for 23 years and operated a lot for the sale of automobiles in connection with his garage.[9] He had a heart condition and on May 4, 1968, he was in an automobile accident. His brother Ernest thereafter operated the garage for him. Ernest did a brake job on Seitz's automobile, and Crane had known Seitz for only two or three weeks. According to Crane's testimony, Seitz in the company of Brown had talked to Ernest about buying the truck. Crane had never before seen Brown. Crane admitted giving Seitz the paper on which appeared in his handwriting "866-8042 Home J. Crane," introduced as Government Exhibit 11. Crane testified that

8. When later opened, the safe was found to contain the property described in the indictment, viz.: "$39.48 cash, $2544.29 stamps stock, 1445 blank money orders, one money order machine, money order validating and limitation stamps."

9. Hospital records later introduced showed Crane's age as 49 years. His only previous criminal record was for larceny at the age of 15 or 16 years for which he served "six months in the workhouse." (Tr. 277).

Ernest lives at Burning Bush, a long distance from the garage, while Crane lives within less than a mile, and further

> "He (Seitz) asked Ernest if they decided if they wanted it could they call him Sunday or some time when we was closed up, if they wanted to buy the truck, how could they get in contact, and he said, 'Well, John lives closer than I do.'
>
> "And I gave him—he said, 'It would be better if you gave them your telephone number because I live at Burning Bush.' " (Tr. 245)

According to Crane's testimony, on this Sunday morning, September 21, at 6:10 o'clock, Seitz telephoned to him.

> "They [sic] said they wanted the truck, they had a job for it, and to come make a bill of sale on it. I said, 'It's not even daylight.' I said, 'Let's wait until it's daylight.' And they said, 'Now, we've got a job for it, and we've got the money, and, if you want to come over and make a bill of sale and sell it, we're interested in it.' I said, 'Well, okay, I'll be over.' " (Tr. 249)

When Crane arrived at the garage "it was dark and real foggy." As Crane unlocked the garage door he got hit.

> "A. I got hit in the head, on the back of the head, and I went down. And I remember enough that I tried to get up, and when I tried to get up they hit me again, and that's all I do remember.
>
> "Q. Now, from that point on do you remember what happened to you?
>
> "A. No, sir.
>
> "Q. When did you regain consciousness?
>
> "A. I was in the bathroom, and, Mr. Griffin and my boys were in there, and I remember my boys

was washing my head, the blood off of my head * * *." (Tr. 257, 258)

The verdict might turn on whether the jurors believed that the blows to Crane's head were inflicted against Crane's will by others, presumably one or more of Crane's three codefendants, or were self-inflicted, as claimed by the Government.[10] The severity vel non of the blows is an important circumstance in that inquiry. Admittedly, the lacerations did not require stitches. Crane testified that with the help of his sons on either side he was taken from the bathroom to a chair in his office, some 28 or 30 feet distant.[11] Cornish testified that there was nothing unusual in the way Crane walked from the bathroom to the outer office and sat down in a chair. It appears without dispute that Crane remained there for more than an hour until his brother Ernest arrived. Ernest testified:

> "When I walked in he was setting [sic] in the chair white as a ghost. He had two lacerations right here and one back here. I asked why he hadn't been to the hospital, and I started to take him to the hospital, and the deputy sheriff said he would take him, and he took him to the hospital." (Tr. 420)

According to the hospital records, Crane was brought to the Emergency Room at Hutcheson Memorial Hospital at 9:45 A.M. on September 21, 1969. The physician on duty at that time was Dr. Sheldon Wohl, then the hospital's Resident Physician and Surgeon. Dr. Wohl did not testify at Crane's trial. Instead, Crane's counsel introduced Dr. Thomas E. Atkins of Rossville, Georgia, Crane's family physician who had treated him for his injuries in the automobile accident of May 4, 1968. Dr. Atkins did not make a notation of the time of day that he first saw Crane but testified,

---

10. We note, however, that Crane's testimony as to the opening of the garage door was not only in conflict with Seitz's testimony but it also was inconsistent with the more reliable testimony of Cornish about following the truck and car to Crane's garage and witnessing the entrance into the garage.

11. In this testimony he was corroborated by his sons.

"As I recall, it was late in the morning." (Tr. 372) Dr. Wohl's affidavit introduced on the amended motion for new trial included the following:

"(12) After remaining in the Emergency Room for about two (2) hours, during which time he was under Affiant's personal observation, Affiant ordered him confined to the hospital as a patient. Affiant understood from some source, now unknown to the Affiant, that MR. CRANE's personal physician was Dr. T. E. Adkins [sic], and it is Affiant's recollection that Dr. Adkins [sic] could not be located and did not see the patient for several hours thereafter." (Tr. 53)

The verdict of the jury was returned on March 18, 1970 (Tr. 554). The original motion for new trial was filed on April 9, 1970, within the time provided by an order entered pursuant to Rule 33, Rules of Criminal Procedure. The motion showed that before the trial Crane's counsel had learned that Dr. Wohl had admitted Crane and treated him but had been unable to locate Dr. Wohl, having been informed only that Dr. Wohl had gone to California. It was true that Dr. Wohl had gone to California, but before Crane's trial he had returned to Chattanooga and was on the staff of the Memorial Hospital in Chattanooga, different from the Hutcheson Memorial Hospital of Fort Oglethorpe, Georgia, to which Crane had been admitted. Neither Crane nor his counsel knew where to locate Dr. Wohl until April 1, 1970 "when his counsel was informed that Dr. Wohl had returned to Chattanooga."[12] The motion continued:

"Movant's counsel immediately contacted the said DR. WOHL by telephone in the emergency room at Memorial Hospital, Chattanooga, Tennessee, where he was on duty, and dis-

cussed his knowledge of the facts, and DR. WOHL stated to movant's counsel that he had been under subpoena, that he had talked to the government attorneys or agents, the names of whom were unknown to him, and that he had been instructed to stand by the telephone all day, waiting for a call to Rome, Georgia to testify, but that he was never called by the United States attorney's office as a witness.

"Movant avers that the nondisclosure by the United States respecting the whereabouts of DR. WOHL entitles movant to a new trial.

"Movant alleges that there was not only a duty on the part of the United States in such case to search for evidence, but a further duty to disclose all of its evidence, however insignificant, to the defendant.

"Movant alleges that the non-disclosure was not a negligent non-disclosure on the part of the United States attorney, but was a deliberate non-disclosure and that the prosecution knowingly suppressed such relevant, exculpatory evidence." (R. 9)

At the time of the filing of the motion, Dr. Wohl had left Chattanooga by automobile and was en route to California. Counsel applied to the court for an order to take Dr. Wohl's deposition at Hollywood, California. The court denied that motion, and also denied the original motion for new trial, stating its reasons in an order from which we quote:

"Grounds four and nine allege that the government suppressed and concealed the evidence of Dr. Shelton Wohl, who, it is contended, treated the defendant at Hutcheson Memorial Hospital shortly after the commission of the crime charged in the indictment. In ground ten, the defendant moves for a new trial because of newly dis-

---

12. The motion does not disclose the source of counsel's information. The affidavit of Mr. Gleason, Crane's attorney, says simply that,

"(10) After the trial of the case and on April 1, 1970, and two (2) days before MR. CRANE was sentenced in

said Court, which was on April 3, 1970, Affiant learned, quite accidentally that there was a DR. WOHL working at Memorial Hospital in Chattanooga, Tennessee, as a resident physician." (R. 103)

covered evidence, *i. e.*, the testimony of Dr. Wohl, which the defendant contends would show that the defendant was unconscious when admitted to the emergency room of Hutcheson Memorial Hospital on September 21, 1969. From the evidence and various affidavits attached to the post-trial motions in this case, it is apparent that the defendant and his counsel knew of Dr. Wohl's treatment of the defendant in advance of the trial of the case. Furthermore, the affidavit of C. R. Netherton, Postal Inspector for the Post Office Department, attached to the brief of the Government's response to the motion for new trial, clearly states that he obtained from the administrative office of Hutcheson Memorial Hospital the address of Dr. Wohl in Chattanooga, Tennessee, in January, 1970, some 45 to 50 days prior to the trial of this case. According to Mr. Netherton's affidavit, the truth of which has not been contested by the defendant, defendant's counsel 'is on the Board of Hutcheson Memorial Hospital and has served in that capacity since the hospital was in the planning stage.' Thus, it appears to the court that defendant's counsel was in as good a position, if not better than Mr. Netherton, to determine the whereabouts of Dr. Wohl. Therefore, grounds four, nine and ten are likewise overruled and denied." (R. 112)

On the day that the court denied the original motion for new trial, counsel for Crane filed an amended motion to which was attached a lengthy affidavit of Dr. Wohl, from which we quote extensively:

"(9) MR. CRANE has [sic] been in the Emergency Room but a short time when Affiant personally made a physical examination of MR. CRANE. Affiant examined MR. CRANE carefully and found two (2) contusions and abrasions on his head which appeared to be the result of violent blows to the skull.

"(10) That the patient could not talk coherently.

"(11) Affiant made a thorough physical examination of MR. CRANE and he did not respond to pin-pricks and various other tests supplied to determine whether or not he was conscious, and in Affiant's opinion, JOHN LOUIS CRANE was unconscious when he arrived in the Emergency Room, and he remained unconscious for a period of two (2) hours after his arrival. While in the Emergency Room during said two-hour period, MR. CRANE did not respond to pain or pin-pricks and was in Affiant's opinion, completely insensible and unconscious.

\* \* \* \* \* \*

"(13) The seriousness of MR. CRANE's condition was manifested by dizziness, vomiting and headaches, and because of the obvious serious injuries to the patient's head, Affiant ordered him confined to the hospital so that his personal physician, when located, could take charge of his case.

"(14) Affiant entered on the records of such hospital his orders, a photostatic copy of which is attached to this Affidavit.

\* \* \* \* \* \*

"(17) Affiant was subpoenaed as a witness by the United States and expected to be called to testify in the case, but was never called by the United States Attorney.

"(18) Affiant informed the United States Attorney, when subpoenaed as a witness, that he would not make a good witness for the United States because it was Affiant's opinion that MR. CRANE was insensibly unconscious for two (2) hours when he arrived in the Emergency Room at Hutcheson Memorial Hospital. Affiant was never called to testify in the case, although he remained by a telephone, as instructed by the United States Attorney's Office, so that he could be called from Chattanooga, Tennessee to Rome, Georgia to testify as a witness if the United States Attorney decided to use his evidence." (R. 52, 53 and 54)

Notice of appeal was filed on June 29, 1970. Thereafter, on July 2, 1970, the district court made an order reading in part:

"Having now considered the amendment together with the Government's response, the Court sees no reason to disturb its original denial of the motion for new trial and therefore declines to request remand of the case from the Court of Appeals for further proceedings on the motion." (R. 80) [13]

■ In United States v. Johnson, 1946, 327 U.S. 106, 111, 112, 113, 66 S.Ct. 464, 90 L.Ed. 562, Mr. Justice Black speaking for the Court opined:

"But it is not the province of this Court or the Circuit Court of Appeals to review orders granting or denying motions for a new trial when such review is sought on the alleged ground that the trial court made erroneous findings of fact. * * *

"The trial judge's findings were supported by evidence. He had conducted the original trial and had watched the case against Johnson and the other respondents unfold from day to day. Consequently the trial judge was exceptionally qualified to pass on the affidavits. * * *

" * * * The Circuit Court of Appeals was right in the first instance, when it declared that it did not sit to try de novo motions for a new trial. It was wrong in the second instance when it did review the facts de novo and order the judgment set aside."

This Court should not reverse for error in denying a motion for new trial unless the district court erred as a matter of law or abused its judicial discretion. 2 Wright Federal Practice and Procedure,

§ 559, pp. 541, 542. As expressed by Judge Goldberg, "A trial court's denial of a motion for new trial is not subject to facile reversal." Lacaze v. United States, 5 Cir. 1968, 391 F.2d 516, 522.

■ Applying those principles of law, we inquire first whether the district court erred *as a matter of law* in denying Crane's motion for new trial.[14] Dr. Atkins testified at length.[15] On cross-examination he admitted that his opinion as to the severity of Crane's injuries was based more upon subjective evidence which could possibly be simulated than upon objective proof. On the other hand, Dr. Wohl's testimony might have been so objectively based as to supply the added weight necessary to cause some or all of the jurors to entertain a reasonable doubt of Crane's guilt, and thus to prevent a verdict of guilty. We think that if the Government actually suppressed Dr. Wohl's evidence, then as a matter of law the district court should have granted a new trial.

The Supreme Court has announced the rule in positive language that:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Brady v. Maryland, 1963, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215.

The principle has been progressively developed both in this Circuit [16] and in other jurisdictions.[17] One of the most enlightening discussions of the extent of the prosecution's constitutional duty to reveal evidence to the defendant is contained in Levin v. Clark, 1967, 133 U.S. App.D.C. 6, 408 F.2d 1209.[18]

---

13. See Rule 33, Fed.R.Crim.P.

14. Our extended discussion of that inquiry happens also to show whether the district court abused its discretion.

15. Pages 368–400 of the transcript.

16. Ashley v. State of Texas, 5 Cir. 1963, 319 F.2d 80.

17. *See* "The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant," 74 Yale L.J. 136–150.

18. In Chief Judge Bazelon's opinion, in which Judge Edgerton concurred, and in Judge Burger's dissenting opinion.

In the present case, a careful study of the evidence has convinced us that the district judge did not err as a matter of law in denying Crane's motion for new trial. Some of the reasons which influence us to so hold are:

First, parts of Dr. Wohl's affidavit may be inconsistent with the evidence of Crane's mental and physical condition during the three or more hours after Crane claims to have been hit and before Dr. Wohl saw him.[19]

Second, both the postal inspector, Mr. Netherton, and the prosecutor, Assistant United States Attorney Forrester, submitted affidavits to the effect that Dr. Wohl did not indicate to either that he would testify favorably to Crane or that Crane was unconscious or insensible and that there was no attempt to influence the issue of whether to call or not to call Dr. Wohl as a witness. Mr. Forrester also swore that "No one associated with the defense ever asked me any questions concerning his whereabouts." (R. 78) Indeed, there is no contention that Crane or his counsel requested any help from the Government in locating Dr. Wohl. That is hard to understand since they were charged with notice that the Government would also try to locate Dr. Wohl as a witness.[20]

Third, the contrast between the diligence of the Government and that of the defendant is striking. Mr. Netherton, the Postal Inspector, as early as January 27, 1970, went to the Hutcheson Memorial Hospital in Walker County, Georgia, and interviewed the Records Custodian. Mr. Netherton was given the date that Crane was admitted and released and the names of the doctors who treated him. On the same date, he went to the office of the Hospital Administrator, where he talked to Mrs. Roxie E. Walker who told him that Dr. Shelton Wohl was employed at Chattanooga and gave him the name of the hospital where he was working. Mr. Netherton then attempted to contact Dr. Wohl by telephone and was told that he was off duty. Netherton's affidavit continues:

"I called Dr. Wohl again on February 2, 1970, and spoke with him concerning the admission of John Louis Crane to the Hutcheson Memorial Hospital. From my notes and memory, I recall that Dr. Wohl stated to me that he had examined Crane and that all that he could determine was that he had received some sort of a blow to [sic] head which had caused minor lacerations. He stated that he treated the minor lacerations. He stated fur-

---

19. 6:30 A.M. to 9:45 A.M. at least. During that period Crane was seen by many people. Yet no one testified that he was unconscious for any one considerable length of time. Crane himself went only so far as to say "I was going and coming. I mean sometimes I would know some things and sometimes I didn't." (Tr. 263) He knew about his sons and Officer Griffin being in the bathroom and washing the blood off his head (Tr. 257, 258), about his sons helping him to the chair in his office (Tr. 258), about his conversation with Officer Griffin (Tr. 260), about the gathering of a large crowd of people, including Judge Adams, Mr. Shumate the Mayor of Rossville, and many other people (Tr. 260), about sitting in the chair for an hour and a half or longer (Tr. 261), about Mr. Nard Watts' offer to take him to the hospital (Tr. 261), about two deputy sheriffs from Walker County taking him to the hospital and their arrival at "approximately 10 o'clock" (Tr. 262), about being taken to the emergency room and treated there by the resident physician and a nurse named Linda Price, and about their giving him two pills and a shot (Tr. 262).

20. The Hospital Chart available to the attorneys on both sides revealed the importance of Dr. Wohl's testimony:

"DATE　　　　　　PROGRESS NOTES
"9–21–69　49 yr. old wh. male hit on head by unknown object. Loss of consciousness for variable length of time followed by nausea and vomiting, headache and Admit for observation　　　　　　　　　　　　　　"s. Wohl"

(R. 55)，Both parties were thus placed on notice that they should locate and interview Dr. Wohl.

ther that because of Crane's complaints of pain and dizziness he was admitted for observation. According to Dr. Wohl, 'TO ME HE WAS JUST ANOTHER PATIENT. THEREFORE, I HAD NO REASON TO DISBELIEVE ANYTHING THAT HE TOLD ME.' I asked Dr. Wohl if he could tell whether Crane received a blow sufficient to cause prolonged unconsciousness and Dr. Wohl stated to me that there was no way to determine this fact as he made no detailed inquiry, again reiterating that he had no reason at that time to disbelieve Crane.

"At no time did Dr. Wohl or anyone else state to me that John Louis Crane was unconscious when admitted to the hospital.

"Mrs. Roxie Walker has stated to me that Frank Gleason, Crane's attorney, is on the Board of the Hutcheson Memorial Hospital and has served in that capacity since the hospital was in the planning stage." (R. 23, 24)

Crane's attorney, Mr. Gleason, deposed in part as follows:

"(6) Affiant called the Hutcheson Memorial Hospital and talked to MARY NEAL, the Records Librarian, and Affiant's secretary also called the hospital and talked to the Records Librarian in an effort to locate the said DR. WOHL.

"(7) Affiant was informed that DR. WOHL had terminated his services at the Hutcheson Memorial Hospital on October 29, 1969; that the records of the hospital did not disclose where he had gone, and that they did not know his whereabouts.

"(8) Affiant was informed by MARY NEAL, the Records Librarian, that she had heard that he was some-

where in California, but where, she did not know and further that she did not know of any one who did know where DR. WOHL was then located.

The effort to locate DR. WOHL began around March 1, 1970, and the case was to be tried on, March 16, 1970.

"(9) Affiant did not know the whereabouts of DR. WOHL on or about March 1, 1970, and could not, with due diligence, locate him in California or any other place, and therefore, could not subpoena him as a witness for MR. CRANE in the trial of the aforesaid case." (R. 102, 103) [21]

Not surprisingly, Mr. Netherton's prompt personal visit to the Hospital proved more effective than Mr. Gleason's late telephone calls. Further, Mr. Gleason failed to follow up on the clear lead to Dr. Wohl's location given by Dr. Atkins in his testimony at Crane's trial.

"Q. And is Dr. Wohl now on the staff of the hospital, or is he gone?

"A. He's gone.

"Q. How long has he been gone from the hospital?

"A. I would make an estimate of about four to four and a half months.

"Q. Do you know where he is?

"A. He's gone.

"Q. Do you know where he is presently practicing, where he is located?

"A. His residence was initially in California. I had heard he was going back.

"Q. But you don't know?

"A. I heard later he was in Memorial Hospital in Chattanooga. But whether he's still there or not I don't know.

"Q. I see." (Tr. 375) [22]

---

21. March 1, 1970, when defendant first attempted to locate Dr. Wohl, was a little more than two weeks before the case was set for trial on March 16, 1970.

22. So far as we have discovered in the record, that testimony was the first in-

timation to the prosecutor that Crane and his attorney had not located Dr. Wohl. There had been every reason to assume that, with the same diligence exercised by the Government, they had found that Dr. Wohl was working at the hospital in Chattanooga.

■ In short, there is no sufficient evidence to prove that the Government suppressed or attempted to suppress the testimony of Dr. Wohl. The foregoing discussion, already too long, suffices also to demonstrate that the district judge did not abuse his judicial discretion. The rule is well stated in § 557, p. 515, of 2 Wright Federal Practice and Procedure, Criminal:

> "A motion based on newly discovered evidence must disclose (1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant." (Footnote omitted.)

We would agree that movant's evidence established (1) and (2). We are doubtful as to (3), but positive that (4) was not established. The district court correctly found that the failure of Mr. Gleason to learn of evidence of Dr. Wohl in time for it to be offered at Crane's trial was due to his own lack of diligence. It follows that the court properly denied Crane's motion for new trial.

## II.

■ The district court exercised its discretion to entertain Crane's motion to suppress made at the trial.[23] While the search warrant was available (Tr. 472), the district court held that the search of the garage was proper as incidental to the lawful arrest of one or all of the accused men (Tr. 474, et seq.). We agree that the validity of the search can be sustained on that ground. Information from an unidentified informant not known to be reliable, coupled with verification of that information in essential particulars, may form a basis for probable cause to arrest. Katz v. Peyton, 4 Cir. 1964, 334 F.2d 77, 78. Cornish's view through one of the garage windows of the activity in the garage did not violate Crane's fourth amendment rights. Gil v. Beto, 5 Cir. 1971, 440 F.2d 666. Before entering the garage, Cornish knew that the Flintstone Post Office had actually been burglarizd during the night and that before daybreak a truck had been driven into Crane's garage followed by two men, one of whom was Seitz (named by the informant). Thus the information furnished by the informant was corroborated to an extent sufficient to constitute probable cause to enter the garage and arrest the defendants.

■ However, since the garage was surrounded so that the accused could not escape, Cornish wisely waited until a search warrant could be issued. Crane did not sustain his burden to prove that search warrant defective. Eaton v. United States, 5 Cir. 1969, 408 F.2d 525, 529. It makes no difference that the search warrant was not formally introduced into evidence. As well said by Judge Thornberry for this Circuit in United States v. Thompson, 5 Cir. 1970, 421 F.2d 373, 377:

> "There was uncontradicted testimony at the hearing that a Louisiana criminal district judge issued a warrant for the search, and this testimony was sufficient to establish the issuance of the warrant. *See* Castle v. United States, 5th Cir. 1961, 287 F.2d 657; United States v. Burkhart, 6th Cir. 1965, 347 F.2d 772. Since the issuance of a warrant was effectively established, the burden of establishing that the search was illegal was on movant-defendant. Rogers v. United States, 5th Cir. 1964, 330 F.2d 535; Batten v. United States, 5th Cir. 1951, 188 F.2d 75; Chin Kay v. United States, 9th Cir. 1963, 311 F.2d 317. Defendant, however, completely failed to sustain his burden of proving that the warrant was illegally issued or executed. Defendant had access to the public records where the warrant was filed; he could have introduced the document into evidence in order to prove that it was illegally issued or executed. He

---

23. See Rule 41(e), Fed.R.Crim.P.

**520**

did not do so. In truth defendant's only complaint is that the prosecution did not introduce the warrant into evidence. We are aware of no rule of procedure, evidence or law that requires the prosecution to introduce a search warrant into evidence under such circumstances as are presented here. There was no error in the trial judge's allowance of testimony concerning the evidence seized at the house of defendant's mother."

The district court properly denied Crane's motion to suppress.

### III.

 In his closing argument to the jury, the Assistant United States Attorney said:

"Now, what did John Crane do? Where did the aiding and abetting come in? I appreciate the fact he didn't go to the post office; he didn't break the locks off, and he didn't physically lift the safe out. He gave them the truck; he told them where to go; he let them in the garage; and he brought the cutting tools up there. And, Lord knows, what else he would have done except at that point they saw the police.

"That is to counsel, command, to associate yourself with the venture as though it is something you want to bring about.

"This is your organized criminal. This is your criminal organizer. He doesn't do the dirty work. He goes out and finds men with hard times, men with families they can't support, or maybe drug addicts or maybe just really bad people—" (Tr. 533)

At this point, Crane's counsel objected and moved for a mistrial. The district court sustained the objection and instructed the jury that "they should not consider that remark by counsel." Counsel said, "I withdraw it, and I apologize." The court declined to declare a mistrial. Clearly there was no reversible error. White v. United States, 9 Cir. 1968, 394 F.2d 49, 55.

### IV.

As said by Judge Brown in Blachly v. United States, 5 Cir. 1967, 380 F.2d 665, 675:

"In considering the motion for judgment of acquittal, F.R.Crim.P. 29(a), the District Judge must consider the evidence in the light most favorable to the Government, McFarland v. United States, 5 Cir., 1960, 273 F.2d 417; United States v. Carter, 6 Cir., 1963, 311 F.2d 934, together with all inferences which may reasonably be drawn from the facts, Cartwright v. United States, 10 Cir., 1964, 335 F.2d 919. The determining inquiry is whether there is substantial evidence upon which a jury might reasonably base a finding that the accused is guilty beyond a reasonable doubt."

The evidence, which we have stated at some length, clearly meets the standard which calls for denial of Crane's motion for judgment of acquittal. See 2 Wright, Federal Practice and Procedure, Criminal, § 467.

The judgment is affirmed.