**Robert SHULER and Jerry Chatman, Petitioners,**

**v.**

**Louie L. WAINWRIGHT, Director, Division of Corrections, State of Florida, Respondent.**

**Civ. No. 64–129.**

United States District Court, M. D. Florida, Jacksonville Division.

May 4, 1972.

Tobias Simon, Elizabeth J. duFresne, Miami, Fla., for petitioners.

Robert L. Shevin, Atty. Gen., Tallahassee, Fla., and Nelson E. Bailey, Asst. Atty. Gen., West Palm Beach, Fla., for respondent.

## OPINION AND WRIT OF HABEAS CORPUS

CHARLES R. SCOTT, District Judge.

Petitioners, death row inmates at the Florida State Prison, Raiford, Florida, seek the issuance of a writ of habeas corpus and allege, *inter alia,* three issues which are presently before this Court. These issues are that (a) defendant petitioners were convicted in violation of the due process clause of the fourteenth amendment of the Constitution through the state's knowing and deliberate use of faked plaster foot casts as evidence, (b) the suppression of exculpatory statements by the prosecution was in violation of the due process clause of the fourteenth amendment of the Constitution, and (c) the tangible evidence seized from the petitioners' homes was illegally and unconstitutionally obtained without a search warrant and contributed to the conviction of the defendants. Upon careful consideration of the argument of counsel and the Court file and on the basis of extensive legal research, this Court concludes that petitioners are, indeed, entitled to relief on the basis of independent consideration given each of the above issues. Therefore, this Court hereinafter grants and issues this writ of habeas corpus.

An understanding of the present posture of this case appears to be an indispensable prerequisite to an appreciation of the issues herein. Upon pleas of not guilty petitioners were jointly tried in the Circuit Court of Lake County, Florida, on July 5, 6 and 7, 1960, for the alleged crime of rape after having

been indicted by the Lake County Grand Jury. At trial the jury returned a verdict of guilty and failed to recommend mercy. Thereinafter, petitioners were each sentenced and committed on September 22, 1960, to death by electrocution in accordance with the mandate of F.S.A. § 794.01.[1] On appeal the Supreme Court of Florida affirmed the convictions[2], considering only two arguments:

(1) That the confessions were not freely and voluntarily made by them, and

(2) That the evidence adduced by the State was insufficient to establish the *corpus delicti.*[3]

About a year later, on June 23, 1962, Shuler and Chatman (the petitioners herein) each filed handwritten, independent petitions for writs of habeas corpus before the Supreme Court of Florida alleging, *inter alia,* that the confessions were procured illegally and that the searches which produced tangible evidence used at trial were illegal. These petitions were denied without opinion.[4] Thereafter, a second petition for a writ of habeas corpus was filed before the Supreme Court of Florida on September 25, 1962, by counsel for the petitioners. Petitioners alleged that the convictions were based upon perjured testimony and faked evidence and that the State had suppressed favorable evidence. Subsequent to the issuance of a rule to show cause, the Supreme Court of Florida appointed a commissioner, Retired Circuit Judge L. L. Parks, to take testimony, receive evidence and report to the court on specified issues. Judge Parks discharged his duty in a two-day hearing commencing March 14, 1963, and in filing a report adverse to petitioners on May 1, 1963. The Supreme Court of Florida adopted *in toto* the report of the commissioner, discharged the rule to show cause and denied the petition.[5]

A petition for writ of habeas corpus was filed herein on May 28, 1964. The substantial allegations of the petition are that the State used faked evidence to procure the convictions, that the state suppressed exculpatory statements, that the State utilized evidence illegally and unconstitutionally obtained without a search warrant to procure the convictions and that the confessions were illegally obtained. Pursuant to the issuance of an order to show cause, a response was filed.

On May 18, 1971, this case was reassigned and transferred to this division of this Court. Subsequent to several hearings concerning issues relating solely to the constitutional questions regarding capital punishment, an order was entered on August 30, 1971, requiring in part that counsel for the parties file memoranda regarding the issues herein and that a hearing be held. Counsel for the parties agreed at the hearing on November 23, 1971, that an evidentiary hearing was not required on three of the issues raised in petitioners' memorandum filed herein November 9, 1971.[6] These

---

1. The statute provides that:

 Whoever ravishes and carnally knows a female of the age of ten years or more, by force and against her will, or unlawfully or carnally knows and abuses a female child under the age of ten years, shall be punished by death, unless a majority of the jury in their verdict recommend mercy, in which event punishment shall be by imprisonment in the state prison for life, or for any term of years within the discretion of the judge. It shall not be necessary to prove the actual emission of seed, but the crime shall be deemed complete upon proof of penetration only.

 F.S.A. § 794.01.

2. Shuler v. State, Fla., 132 So.2d 7 (1961).

3. *Id.* at 8.

4. Shuler v. Cochran, Fla., 146 So.2d 380 (1962); Chatman v. Cochran, Fla., 146 So.2d 380 (1962).

5. Shuler v. State, Fla., 161 So.2d 3 (1964).

6. Pertinent portions of this Court's order of December 1, 1971, are the following: Counsel for the parties attended a conference before the Court on Tuesday, November 23, 1971. The purpose of the conference, as set forth in this Court's order of August 30, 1971, was to dis-

three issues are those discussed *supra* in paragraph one.[7] All parties agreed to submit these three issues to the Court on the basis of the entire record in the case, including the original trial transcript of the proceedings in the Circuit Court of Lake County, the transcript of habeas corpus proceedings before Commissioner Parks in March 1963, and the Commissioner's report to the Supreme Court of Florida. Thereafter, the parties filed memoranda with the Court.[8] The transcribed statements of the victim were filed herein by respondent on January 26, 1972. It was agreed and stipulated at the final hearing on January 27, 1972, that these statements of the victim are authentic.

Counsel for the parties have orally stipulated that there has been an exhaustion of State remedies on each of the three issues presently considered. Upon consideration, the Court concludes independently that this is the case, for each of the three issues before this Court have been separately considered and ruled upon by the Supreme Court of Florida. The Supreme Court of the United States has denied a petition for a writ of certiorari.[9] 28 U.S.C. § 2254; Fay v. Noia, 372 U.S.

cuss and determine factors which will affect the feasibility, time and length of an evidentiary hearing. The Court heard lengthy argument of counsel and also received the conference memorandum prepared by the petitioners. Therein, petitioners set forth the existence of four issues now before this Court as follows:

(a) Defendant petitioners were convicted in violation of the due process clause of the Fourteenth Amendment through the state's knowing and deliberate use of faked plaster foot casts as evidence.

(b) The suppression by the prosecution of exculpatory statements and lack of identification by the victim where such evidence was obviously material to the guilt and/or punishment of at least one of the petitioners was in violation of the due process clause.

(c) All of the tangible evidence seized from petitioners' homes was illegally and unconstitutionally obtained without a search warrant and contributed to the conviction of the defendants.

(d) Considering the totality of the circumstances surrounding the taking of petitioners' confessions, such confessions cannot be considered voluntary nor should they have been admitted at time of trial.

All parties agreed that with regard to issues (a), (b) and (c), the law does not require an evidentiary hearing in the United States District Court. Both parties have agreed to submit these three issues to the Court based upon the entire record in the case, and particularly upon the original transcript of trial in the Circuit Court of Lake County, the transcript of habeas corpus proceedings before Commissioner Parks in March 1963, and the commissioner's report to the Supreme Court of Florida. The petitioners have requested an evidentiary hearing with respect to the matters set forth in issue (d) (the admissibility of confessions). This Court will postpone any consideration of this issue—either on its merits or upon the propriety of this Court considering the issue on its merits—until a later date.

7. The issue of the constitutionality of the imposition of the death penalty was withheld from consideration; for it was agreed that, if the court granted relief on any of the three issues hereinabove discussed, this issue would be mooted.

8. The perspective with which respondent views the writ of habeas corpus can best be demonstrated by a passage from the December 16, 1971, memorandum. (*See* Ex parte Bollman, 8 U.S. (4 Cranch) 75 at 95, 2 L.Ed. 554 (1807); *Cf.* Peyton v. Rowe, 391 U.S. 54 at 58, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968)).

Respondents' memorandum provides at p. 11:

Doubtless the petitioners' legal counsel would have a federal referee participating in state court criminal trials, calling the shots as he—a federal government official—sees them, yelling foul every time the State calls as a prosecution witness a person other than the particular individual the federal referee would have called if he were responsible for proving up a case of guilt as charged. In effect that is what the petitioners through their legal counsel seek in this case—a little Monday morning quarterbacking by this Federal Court of the State prosecuting team's winning plays during a state court criminal trial.

9. Shuler v. Florida, 379 U.S. 892, 85 S.Ct. 163, 13 L.Ed.2d 96 (1964).

391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Brown v. Allen, 344 U.S. 443, 73 S.Ct. 437, 97 L.Ed. 469 (1953); Wade v. Mayo, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647 (1948); Thomas v. Decker, 434 F.2d 1033 (5th Cir. 1970); *cf.* Picard v. Conner, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed. 2d 438 (1971).

## I. THE "FAKED" PLASTER FOOTCASTS

Petitioners, black men, were convicted of the crime of rape. The victim was a white woman. At the trial circumstantial evidence was introduced which tended to prove the presence of the defendants at the scene of the alleged crime. Near perfect plaster of paris footcasts were part of this circumstantial evidence. These footcasts were introduced into evidence on the basis of the testimony of Deputy Sheriff James Yates.[10] The State relied in part on this evidence and argued to the jury that ". . . quite often it (circumstantial evidence) is more positive than any direct evidence".[11]

Sometime shortly before the filing of the second petition for writ of habeas corpus before the Supreme Court of Florida, Noel Griffin, Jr. and Thomas Ledford, formerly employed as Deputy Sheriffs of Lake County, Florida, at the time of the criminal investigation and trial, came forward and publicly stated that the plaster of paris footcasts introduced at trial had been fraudulently manufactured in the back yard of, and by, Deputy Sheriff L. G. Clark. At the commissioner's hearing extensive evidence was taken regarding these footcasts.

At the evidentiary hearing before the commissioner, Special Agent Richard W. Flach of the Federal Bureau of Investigation was called as a witness by the petitioners. Flach, who was a professional of 20 years' experience in the FBI's Washington laboratory and who customarily examined evidence involving botanical materials, soils, rocks, minerals and anything of a mineral nature, was qualified as an expert without objection. Flach testified that he had received ". . . a pair of boots, two left shoes, six plaster casts, six specimens of soil from a scene and five specimens of soil taken from a back yard".[12] It was developed without objection that the six specimens from the "scene" were those taken from the "scene" of the alleged rape, that is, from around the home of the victim, and that the five specimens from the "back yard" were those taken from the yard of Deputy Sheriff L. G. Clark. The respective soil samples were compared with soil clinging to the plaster of paris footcasts. Special Agent Flach concluded:

. . . I could state that the soil that I removed from the six casts could not have come from the scene of the alleged rape, and that the soil on the casts that I had removed could have come from the scene—I mean from the backyard specimens, the same scene as the backyard specimens.[13]

On cross-examination there was an attempt to discredit this testimony by exploring the possibility of whether the effect of washing caused by rain and slope could have removed so much of the topsoil from the ground at the crime scene as to make the comparison and conclusion impossible. However, such a possibility was deemed "a very extreme remote possibility"[14], and Flach concluded that he could ". . . make a very positive statement . . . and say it (the soil clinging to the footcasts) did not

10. The testimony of Deputy Yates appears in the trial transcript (hereinafter TT) at 291–311.

11. TT at 463. Argument by Assistant State Attorney John W. McCormick.

12. This testimony of Special Agent Richard W. Flach appears in the transcript of the commissioner's hearing (hereinafter CH) at 87.

13. CH at 88.

14. *Id.* at 94.

come from the crime scene because it was so entirely different".[15]

Petitioners next called Special Agent Curtis Thompson of the Federal Bureau of Investigation who was qualified without objection as an expert witness. Thompson was also a veteran of 20 years' experience with the FBI's Washington laboratory and in his professional capacity examined such evidence as shoe prints.

Thompson compared the six plaster footcasts with the four shoes. He found that two of the casts could not have been made by any of the shoes. He was able to state positively that three of the remaining casts were made by three of the remaining shoes. He observed that the casts were "almost perfect" and "very very clear".[16] Such footcasts, he concluded on the basis of his experience, are "not normally the case".[17] The footcasts which he examined were "perfectly flat"[18], a circumstance which would not normally be the case when a person walks in sandy ground; for, in moving, walking or running, usually the toe and heel areas are depressed. Therefore, Special Agent Thompson concluded that the plaster of paris casts varied from what he would normally expect to find in such casts made by people moving in the sand.[19]

Former Deputy Sheriff Noel E. Griffin, Jr. testified at the commissioner's hearing that there were only three partial footprints at the crime scene when he and former Deputy Sheriff Ledford arrived.[20] These partial prints were covered.[21] Griffin testified that he was certain there were only three partial prints because (1) the whole area was searched, (2) it rained after the three partial prints were covered, (3) the victim had chickens which would have destroyed any other prints, and (4) the deep sand around the house would not admit of perfect prints.[22] Therefore, Griffin testified, the plaster of paris footcasts introduced at trial could not have possibly been made at the crime scene.[23] Finally, Griffin testified that at a pretrial meeting with State Attorney Gordon G. Oldham, Jr., he was commanded by Oldham not to ". . . mention the word 'rain', don't even think about it. . . . . It will mess things up".[24]

Former Deputy Sheriff Thomas Ledford was also called as a witness at the commissioner's hearing by the petitioners. Ledford also testified that there were only three partial footprints at the crime scene when he and Griffin arrived.[25] Ledford also testified that it rained[26] and that State Attorney Oldham instructed the witnesses at a pre-trial conference that they ". . . were not to mention rain in any part, portion, or any way during this trial, because if we did it would mess things up".[27] Petitioners' attorney also attempted to solicit from Ledford the statement which Deputy Lucius G. Clark made to him at the trial immediately following Ledford's trial testimony.[28] Ledford's answer was excluded by the commissioner as hearsay. An answer to the propounded line of questioning would have tended to resolve the issue as to whether Deputy Clark admitted to Ledford that the plaster of paris footcasts were falsely manufactured in Clark's back yard.

Due process is a constitutional requirement, insured by the fourteenth amendment, which safeguards the lib-

---

15. *Id.* at 96.

16. *Id.* at 102.

17. *Ibid.*

18. *Ibid.*

19. *Id.* at 103.

20. *Id.* at 35, 43 and 45. Griffin and Ledford arrived at the crime scene before Deputies Yates and Clark.

21. *Id.* at 36.

22. *Id.* at 43–45, 47.

23. *Id.* at 41, 47.

24. *Id.* at 39.

25. *Id.* at 9 and 19. The prints were a "definite heel print", a "half-track", and a "toe print".

26. *Id.* at 11–12.

27. *Id.* at 15.

28. *Id.* at 15–18.

erty of a citizen against deprivation by the State. It embodies those fundamental conceptions of justice which lie at the base of our civil and political institutions. Herbert v. Louisiana, 272 U.S. 312, 47 S.Ct. 103, 71 L.Ed. 270 (1926).

> Thus, as assurance against ancient evils, our country, in order to preserve 'the blessings of liberty', wrote into its basic law the requirement, among others, that the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed.

Gallegos v. Colorado, 370 U.S. 49, 51, 82 S.Ct. 1209, 1211, 8 L.Ed.2d 325 (1962), quoting Chambers v. Florida, 309 U.S. 227, 237, 60 S.Ct. 472, 84 L.Ed. 716 (1939). Thus, the purpose of the due process clause is not to protect an accused against a proper conviction but against an unfair conviction. Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947).

■ Due process requires more than mere notice and hearing: It cannot tolerate a State conviction masked as justice when such conviction is contrived through the pretense of a trial which deprives a defendant of liberty and which is based on a deliberate deception of court and jury through the State's presentation of testimony known to be perjured. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). As applied in a criminal trial, a denial of due process is the failure to observe that fundamental fairness which is essential to the very concept of justice. Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941); cf. Hysler v. Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932 (1942).

■ The deception which results from negligent nondisclosure is no less damaging than that deception which is a product of guile, and such negligent nondisclosure entitles a defendant to relief. Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966); Ashley v. Texas, 319 F.2d 80 (5th Cir. 1963); Barbee v. Warden, 331 F.2d 842 (4th Cir. 1964); cf. United States v. Pearson, 448 F.2d 1207 (5th Cir. 1971); United States v. Crane, 445 F.2d 509 (5th Cir. 1971).

■ It makes no difference whether the withholding of evidence or giving of perjured evidence is by the prosecutor or by officials other than the prosecutor. Smith v. Florida, 410 F.2d 1349 (5th Cir. 1969); cf. Augenblick v. United States, 377 F.2d 586, 597–598, 180 Ct. Cl. 131 (1967); Ellis v. United States, 120 U.S.App.D.C. 271, 345 F.2d 961 (1965). See also Mottram v. Murch, 330 F.Supp. 51, 58 (S.D.Me.1971). Perjured testimony and evidence given by a state official such as a deputy sheriff or detective is such as to pass the line of tolerable imperfection and fall into the field of fundamental unfairness. See Curran v. Delaware, 259 F.2d 707 (3d Cir. 1958).

■ The test which this Court must apply in determining whether to issue a writ of habeas corpus and grant a new trial is not whether the new evidence is merely cumulative or impeaching but, rather, whether the new evidence is material and such that, if presented to a jury at a new trial, would probably produce an acquittal. United States v. Dara, 429 F.2d 513 (5th Cir. 1970); Lopez v. United States, 406 F.2d 903 (5th Cir. 1969). See also, e. g., United States v. Balistrieri, 436 F.2d 1212 (7th Cir. 1971); United States v. Davila, 428 F.2d 465 (9th Cir. 1970); United States v. Miller, 411 F.2d 825 (2d Cir. 1969); Batsell v. United States, 403 F. 2d 395 (8th Cir. 1968); United States v. Faustin, 371 F.2d 820 (2d Cir. 1967).

■ There is no issue that the "new evidence" was discovered by petitioners herein subsequent to their convictions in the trial court. This new evidence that the plaster of paris footcasts was falsified by officials of the State springs

from such reliable sources that it would appear doubtful whether the footcasts would be introduced by the prosecution at a new trial. However, regardless of the State's tactics at a new trial, it is the considered opinion and conclusion of this Court that, if the "new evidence" were presented at trial, it would probably result in an acquittal of the defendants. Indeed, rational and fair men cannot honestly and ethically dispute the point.

It is difficult, to the point of being nearly impossible, to imagine how such petitioners, convicted upon the State's deliberate presentation of testimony known to be perjured, could ever better prove a case for post-conviction relief.

This Court will not permit the conviction of these petitioners on such tainted and falsified testimony. The organs of government do not need convictions based upon such testimony. A strong and free nation cannot abide this type of "justice". Not only our Constitution, but the interests of justice itself, require and demand a new trial. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217 (1959); Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956). Consequently, upon consideration of this issue alone, this Court hereinafter grants and issues this writ of habeas corpus.

## II. THE SUPPRESSION BY THE STATE OF EXCULPATORY STATEMENTS

Subsequent to her alleged rape on the night of March 10, 1960, the victim was admitted to the Durham Young Hospital in Leesburg, Florida. The next day at or about 1:30 P. M., after Robert Shuler and Levi Summers (an alleged accomplice who testified for the State at the trial) were taken to the victim's hospital room by sheriff's deputies for her possible identification in a line-up or show-up type situation which appears to have been conducted in a substantially, if not wholly, constitutionally defective manner, the victim gave transcribed statements in response to questions propounded by Assistant State Attorney John W. McCormick. These sworn statements were recorded, transcribed, certified and reported before and by Joan E. Tobey, a Deputy Official Court Reporter and Notary Public of the State of Florida.[29] There is no dispute between the parties that the transcript is authentic, and a copy thereof was filed by the State herein on January 22, 1972. The evidence is uncontradicted that the State suppressed this evidence and never furnished it to the defense.[30] After a careful study this Court concludes that this statement is favorable evidence of an exculpatory nature which is material to both the guilt and punishment of each petitioner herein. Petitioners Robert Shuler and Jerry Chatman are entitled to a new trial on this allegation without regard to any other issue in this case.[31]

This Court considers and hereby finds the transcribed statement of the victim to be favorable evidence of an exculpatory nature which is material to both the guilt and punishment of both petitioners on the basis of, *inter alia*, an in-

29. *Id.* at 129–34.

30. *See Id.* at 209–214 (testimony of State Attorney Gordon Oldham) and at 163–177 (testimony of Assistant State Attorney John McCormick).

31. The Court notes that petitioners were convicted without testimony having been given by the victim of the rape. Thus, a substantial issue was raised on direct appeal as to whether *corpus delicti* was sufficiently established. The Supreme Court of Florida held that *corpus delicti* could be established by circumstantial evidence and that, in the instant case, it had been sufficiently established by either direct evidence or evidence from which a reasonable inference could be drawn. *See* Shuler v. State, Fla., 132 So.2d 7 (1961).
In a handwritten letter dated November 1, 1960, the victim communicated with L. C. Clarett, Shuler's grandfather, and wrote, *inter alia*, that "[h]e (Robert Shuler) did not rape me and you can use this letter in writing the governor yourself. . . . ."

dependent consideration of each of the following contents of the statement:

1. The "oldest one" was "in his forties or close to his fifties". He was "much older" than the younger boy. (The record reflects that, on the date of the alleged crime, petitioner Jerry Chatman was 23 years old and Robert Shuler was 20 years old). Exculpatory statement (hereinafter ES) at 7 and 17.

2. The youngest boy was "about seventeen". ES at 9.

3. The victim indicated that the youngest boy did not sexually molest her as he was hunting through a closet and looking at items on the bed the "entire time". ES at 7–8 and 10–11.

4. The victim was not certain whether she had been raped. ES at 9 and 12.

5. The victim believed she could have recognized the younger boy if she could have seen him again, because she had seen him before. ES at 9 and 16.

6. The younger boy engaged in no beating of the victim. ES at 10.

7. The victim did "not especially" recognize either of the boys who had been brought to her room earlier the day of the transcribed statement and whom she had seen. (Petitioner Robert Shuler and Levi Summers were those individuals). ES at 16 and 17.

 The State has raised an issue as to the consequence of the suppression since the maker was subsequently declared insane on March 25, 1960. This issue may be summarily resolved on two points. First, it is salient that the adjudication of incompetency was subsequent to the uttering of the statement. Respondent has cited no authority, nor does this Court know of any, to support the proposition that an adjudication of insanity gives retrospective rise to a rebuttable presumption of prior insanity. *Cf.* 17 Fla.Jur. Insane, Etc., Persons § 62; 13 Fla.Jur. Evidence §§ 88, 89. Second, and regardless of the first point, under Florida law the rule is that an adjudication of insanity is merely prima facie evidence and may be rebutted by competent evidence tending to show that the alleged insane person was of sound mind at the time in question. Florida Light & Power Co. v. Robinson, Fla., 68 So.2d 406 (1953); *See* 13 Fla.Jur. Evidence §§ 88, 89.

 It is an established and unquestionable rule of constitutional law that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This principle is grounded upon the concept of a fair trial, which is at the very base of the constitutional guarantee of due process, and is applied to the states through the fourteenth amendment. *See* Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). This rule is of substantial long standing, and it is doubtful whether a contrary position could ever have been rightly advanced. *Cf.* United States ex rel. Thompson v. Dye, 221 F.2d 763 (3d Cir. 1955); United States v. Rutkin, 212 F. 2d 641 (3d Cir. 1954); *See also* United States v. Crane, 445 F.2d 509 (5th Cir. 1971); Clark v. Reid, 441 F.2d 801 (5th Cir. 1971); Turner v. Ward, 321 F.2d 918 (10th Cir. 1963); Ashley v. Texas, 319 F.2d 80 (5th Cir. 1963).

 The primary duty, commanded by the due process clause, of a lawyer engaged in public prosecution is not to convict but to see that justice is done. Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968). Consequently, the prosecuting attorney has a duty to refrain from improper methods in obtaining an illegal conviction just as he has a duty to utilize every legitimate means to secure a just conviction. Berger v.

United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The suppression of facts capable of establishing the innocence of the accused is highly reprehensible; and it is not solely for the prosecution to decide for the court what is admissible or for the defense what is useful. Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968); Griffin v. United States, 87 U.S.App.D.C. 172, 183 F.2d 990 (1950).

▮▮▮ The standard applied to exculpatory statements is whether such a statement is "favorable". Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to declare a federal constitutional error harmless, a court must be able to declare a belief that it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). If the suppressed evidence might have led a jury to entertain a reasonable doubt, the error is not harmless. Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968); United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971); Levin v. Clark, 133 U.S.App. D.C. 6, 408 F.2d 1209 (1967). Even if favorable evidence is not admissible at trial, its suppression is constitutionally impermissible when it is "favorable" because it is "useful". Giles v. Maryland, 386 U.S. 66, 98–99, 87 S.Ct. 793, 17 L.Ed. 2d 737 (1967) (Fortas, J., concurring).

▮▮▮ The duty to disclose evidence of an exculpatory nature arises when the prosecution is aware of its existence. Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968). And, with regard to a demand by the defense, if the defense does not know of the existence of such favorable evidence, suppression thereof by the prosecution cannot be permitted; for, if otherwise, the rule would be nugatory. That is to say, the Brady rule, supra, must mean something more than that the defense is entitled to that which it already knows. See Giles v. Maryland, 386 U.S. 66, 102, 87

S.Ct. 793, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring).

▮▮▮ In the instant case, the transcribed statement was exculpatory to each accused on both the issues of guilt and punishment. It is beyond question that the introduction of this evidence might have led the jury to entertain a reasonable doubt as to each petitioner herein. And, regardless of whether this evidence would have been admissible, it was favorable and useful to each accused. Although the question is an open one whether the prosecution acted in good or bad faith, this is an irrelevant consideration; for, even if in good faith, the error was and is constitutionally impermissible. The suppression of the sworn statements of the victim denied each petitioner herein due process of law and a fair trial. Consequently, this Court hereinafter orders a new trial.

### III. THE ILLEGAL SEARCHES AND SEIZURES

It is undisputed and uncontradicted by the parties and this Court therefore finds that petitioner Robert Shuler was a paying tenant with Levi Summers in a room in the home of his grandfather and landlord, L. C. Clarett. At the Clarett home, petitioner Shuler and Summers were arrested without a warrant on Friday, March 11, 1960. There is no allegation that there was a search at the time of arrest.[32]

On the day following the arrest, Deputies James Yates and J. P. Spence returned to the Clarett home without a search warrant. It is apparent from the record and undisputed that the purpose of this appearance was to search for evidence.[33] Deputy Yates met Clarett in the front yard. The State urges that Clarett consented to a search of Shuler's rented room; petitioner raises the issue that whatever was said, if anything, was the product of a 1960 small town confrontation between white sheriff's deputies and an elderly black fruitpicker

---

32. TT at 296.

33. See TT at 275 (testimony of Spence) and 293 (testimony of Yates).

who, even if he knew or understood his right to object to a warrantless search and thereby bar it, had no meaningful choice.

The deputies seized several monogrammed handkerchiefs in Shuler's room. These were admitted into evidence at the trial as State's Exhibit No. 21.[34] Since one or more bloody hankerchiefs had allegedly been discovered at or near the victim's home, this arguably linked Shuler with the crime scene.

The deputies also seized undershorts with blood on the fly from under Shuler's bed in his room. These were admitted at trial. Although the State has never explicitly claimed that Shuler was wearing more than one pair of undershorts at the time of the alleged crime, the record reflects that at least three and possibly four undershorts with blood on the fly were introduced at trial.[35] It is not clear whether this evidences thorough and sifting investigation and trial preparation by the sheriff's office and the prosecuting officials or whether it evidences some medical problem of Shuler's.

Petitioner Jerry Chatman was arrested without a warrant at *circa* 8:30 P. M. on Friday, March 11, 1960, at the Fain Theatre in Leesburg, Florida, by sheriff's deputies. It is clear that any search of Jerry Chatman's home was without his consent. Sheriff's deputies made two searches at his home on the Saturday following the alleged crime and evidence there seized was introduced by the State and admitted at trial as evidence.

Petitioner Chatman urges that these searches violated his rights as guaranteed by the fourth amendment. Petitioner raises the issue that, regardless of whether Chatman's wife consented to the search, first, she had no meaningful alternative to allowing a search when she, a black woman, was confronted with white sheriff's deputies in a small town in 1960 and, second, as a wife she could not consent to a search under the then existing applicable rule of law.

Several items seized at Chatman's home during the warrantless searches were introduced at the trial by the State and admitted into evidence: his shorts were admitted as State's Exhibit No. 18 [36]; his khaki pants were admitted as State's Exhibit No. 17 [37]; and a gun was admitted as State's Exhibit No. 11.[38] Another warrantless search conducted under similar circumstances by Deputy Yates yielded a pair of Chatman's shoes. These were produced by the wife when Deputy Yates "asked" for them. They were admitted at trial as State's Exhibit No. 22.[39] These were some of the shoes which matched the near perfect plaster of paris footcasts.[40]

The right of privacy guaranteed by the fourth amendment of the Constitution is enforceable against the states through the due process clause of the fourteenth amendment. Thus, it is *the same rule as is applied against the* federal government. *See* Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The fourth amendment guarantees are enforced

---

34. TT at 297.

35. Undershorts with blood on the fly were admitted as State's Exhibit No. 15. These were allegedly found by Deputy Spence pursuant to a warrantless search of Shuler's room. TT at 275–76 (testimony of Spence).
Undershorts with blood on the fly were admitted as State's Exhibit No. 16. These were allegedly taken off Shuler's body in the presence of Deputies Yates and Clark at the jail subsequent to the arrest. TT at 309–10 (testimony of Yates). Also, undershorts taken off Shuler at the jail were later identified

by Deputy Clark as State's Exhibit No. 31. TT at 312 (testimony of Clark). Undershorts with blood on the fly were admitted as State's Exhibit No. 12. These were allegedly discovered in Shuler's room by Deputy Yates pursuant to his warrantless search. TT at 311 (testimony of Yates).

36. TT at 279.

37. *Ibid.*

38. *Id.* at 278.

39. *Id.* at 305 and 309.

40. *See* Part I, *supra.*

against both the states and the federal government by an exclusionary rule which provides that all evidence obtained by searches and seizures in violation of the Constitution is inadmissible in a state court. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (decided June 19, 1961). The *Mapp* decision has been held to apply retrospectively to those cases not finally decided on direct appeal as of the date of the *Mapp* decision. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). The Supreme Court of Florida did not decide the direct appeal from the state trial court convictions in the instant case until July 7, 1961. Consequently, the exclusionary rule applies in the instant case.

It is well established that a search or seizure carried out on a suspect's premises without a warrant, that is to say, outside the neutrality of the judicial process, is *per se* unreasonable, unless the police authority can show that it falls within one of a carefully defined set of exceptions. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Although the police have a right, when a person is lawfully arrested, to make a contemporaneous search without a warrant of the person and, to an extent depending upon the circumstances of the case, of the place where he is arrested, it is clear that there is no right within the police authority to search a house not the situs of the arrest or to search such a house at a time not contemporaneous with or incident to an arrest. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). No amount of probable cause can overcome this rule. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). None of the searches which produced tangible evidence admitted at trial were incident to or contemporaneous with the warrantless arrests of petitioners herein regardless of the issue of whether the warrantless arrests were lawful.

Consent is an exception to the rule which provides against warrantless searches. However, a paying tenant in a house, boarding house or hotel is entitled to protection, constitutionally guaranteed, against unreasonable searches and seizures. Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). *See also* United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949). If this were not the rule, then the constitutionally guaranteed protection would depend upon the unfettered discretion of the landlord. Consequently, whatever, if any, consent was given in the instant case by the landlord, Mr. Clarett, was violative of Shuler's constitutionally guaranteed right to protection against unreasonable searches and seizures with regard to both the handkerchiefs and the undershorts.

Petitioners have also urged that, even if the landlord was legally capable of consenting to a search, the consent, if any, was defectively and unlawfully procured under all the facts and circumstances. Such a consent, if given, was a waiver of a fundamental and constitutionally protected right. The rule is that courts indulge every reasonable presumption against such a waiver which is defined as ". . . ordinarily an intentional relinquishment or abandonment of a known right or privilege". Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). A waiver cannot, therefore, be valid unless the person knows that his permission may be freely and effectively withheld. Perkins v. Henderson, 418 F.2d 441 (5th Cir. 1969). The corollary of this rule is that one cannot intelligently surrender that which he does not know he has.

When the State seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be met by merely showing no more than acquiescence to a claim of lawful authority. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In this case there has been no showing whatsoever that Clarett's consent, if any, was anything more than mere acquiescence to a claim of lawful authority. Consequently, respondent has failed to meet its burden; and this Court therefore finds that Clarett's consent, if any, was not an intentional relinquishment or abandonment of a known right or privilege. Thus, any consent was constitutionally defective and the handkerchiefs and undershorts seized in Shuler's room and admitted against him at trial must be subjected to the exclusionary rule. *See* Mapp v. Ohio, *supra.*

■ The same ruling is applicable to the tangible evidence seized at Chatman's house and admitted at trial; for the respondent has failed to meet its burden as discussed *supra.* Consequently, this Court finds that Daisy Chatman's consent, if any, was not an intentional relinquishment or abandonment of a known right or privilege.

■ Additionally, with regard to the tangible evidence seized at Chatman's house and admitted against him at trial, the State relies on the consent of Chatman's wife. Under the then existing rule of law, a wife could not consent to such a search; for she was without authority to bind her absent husband.[41] Cofer v. United States, 37 F.2d 677 (5th Cir. 1930). *See also* Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921).

■ The test which this Court must apply to these search and seizure issues is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). This Court finds that there is undoubtedly a reasonable possibility that the admitted evidence illegally seized might have contributed to the convictions of Robert Shuler and Jerry Chatman. Therefore, this ·Court, upon independent consideration of the search and seizure issues alone, hereinafter grants the petition for writ of habeas corpus and orders a new trial.

## IV. CONCLUSION

■ This Court has examined the above discussed issues on the allegation that there are federal constitutional deprivations. It is the unquestionable duty of this Court so to do, for it is the fundamental and overiding responsibility of this Court to maintain the Constitution inviolate. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). *See also* Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L. Ed. 868 (1886). Obviously, this decision, although only relatively recently assigned to this division of this Court, comes long after the trial court conviction of these petitioners.[42] However,

41. This rule was changed in United States v. Thompson, 421 F.2d 373 (5th Cir. 1970). However, such change occurred 10 years after the trial of petitioners herein and was not applied retrospectively.

42. Indeed, this writ of habeas corpus issues more than 11 years after the initial trial court convictions. Much can happen during such long years. In the Court file there appears a reproduction of a letter mailed by petitioner Chatman to his attorney. It was filed herein on February 5, 1965, and it provides:
Attorney of Law
Mr. Tobias Simon
223 S. E. First St.
Miami, Florida
Dear Sir "Mr. Simon'
I'm writting to you concerning a majar decision that I have made concerning my future. after long & carefully, considering my predicament. I have come to the conclusion that I prefer to die rather then to live "life has become to

this Court may not and will not disregard the Constitution because of the lateness of the hour or because courts previously considering this case were not earlier able to enforce what our Constitution demands. Chessman v. Teets, 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253 (1957).

This Court is concerned with justice, for without it neither the greater nor the lesser of us is free. However, in reaching this decision, this Court is in no way making any determination as to the guilt or innocence of these petitioners; this opinion merely stands for the proposition that these petitioners did not receive a fair trial. Consequently, irrespective of how heinous the crime in question may have been, whoever may be charged with having committed it must be afforded a fair trial. This Court shall not, nor will it ever, require less.

Therefore, it is

Ordered:

1. The petition for writ of habeas corpus, filed herein May 28, 1964, and as amended on November 25, 1964, is hereby granted.

2. Petitioners Robert Shuler and Jerry Chatman are hereby granted this writ of habeas corpus.

3. Execution of the sentences imposed on September 22, 1960, of death by electrocution upon the petitioners Robert Shuler and Jerry Chatman, each or either, by the respondent Louie L. Wainwright his agents and employees, or any other official of the State of Florida or the Florida State Prison, are hereby stayed and enjoined.

4. The convictions of petitioners Robert Shuler and Jerry Chatman are hereby vacated and set aside.

5. The State of Florida is hereby allowed to and including February 1, 1973, within which to retry petitioners herein if it so desires.

6. The United States Marshal for the Middle District of Florida, or his authorized representative, is hereby directed to serve personally a copy of this opinion and writ of habeas corpus on Louie L. Wainwright, Director, Florida Division of Corrections, Tallahassee, Florida; L. L. Dugger, Superintendent, Florida State Prison, Raiford, Florida; J. F. Tompkins, Assistant Superintendent, Florida State Prison, Raiford, Florida; Robert Shuler, Florida State Prison, Raiford, Florida; and Jerry Chatman, Florida State Prison, Raiford, Florida.

7. Petitioners Robert Shuler and Jerry Chatman shall be confined at and in the Florida State Prison, Raiford, Florida, pending final disposition of this case, except for scheduled court appearances.

---

me only a everyday burden for I'm extremely ill in health and treatment here for any illness is so hard to come by. I haven't become all of sudden unafraid of death" it is just from my illness I suffer everyday' & from death I can only suffer once' so I will take death in the place of this madhouse.
So I ask of you Sir as my attorney to make all the arrangement with the governor so that I maybe executed as soon as possible.
Sir I like for you to know that I appreciate all that you have done for me 'I appreciate it more than you could ever know' and I hope that you will understand the position that I have taken "& the why of such a decision. Now Sir 'I would like to say that Shuler knows nothing about my decision' I did't tell him because I know he still have desire & hopes of liveing "& if he should come to such a decision as this' I would't wont it to be because I have reached such a decision" I thought about it better than a year. So Sir 'I Sincerely hope that you all will continue to do whatever you all con to help him' I would't wont a decision that I have made only for myself to cause another hardship" then again Sir I think that he will stand a better chance because of my decision I would like to use death as my peacemaker.

Humbly
&
Sincerely your From
Jerry Chatman