Robert SHULER and Jerry Chatman, Petitioners-Appellees,

v.

Louie L. WAINWRIGHT, Director, Division of Corrections, State of Florida, Respondent-Appellant.

No. 72-2481.

United States Court of Appeals, Fifth Circuit.

March 27, 1974.

Robert L. Shevin, Atty. Gen., Tampa, Fla., Gordon G. Oldham, Jr., Leesburg, Fla., Dan R. Warren, Daytona Beach, Fla., for respondent-appellant.

Tobias Simon, Elizabeth J. duFresne, Miami, Fla., Jack Greenberg, Charles S. Ralston, Jack H. Himmelstein, New York City, Anthony G. Amsterdam, Stanford University Law School, Stanford, Cal., for petitioners-appellees.

Before COLEMAN, AINSWORTH and DYER, Circuit Judges.

COLEMAN, Circuit Judge:

This is an appeal from a judgment granting habeas corpus relief to Robert Shuler and Jerry Chatman, Shuler v. Wainwright, 341 F.Supp. 1061 (M.D., Fla., 1962). In part, we reverse the judgment of the District Court and we remand the remainder for further proceedings.

In Lake County, Florida, on the night of March 10, 1960, a fifty-six year old spinster, who lived alone, was driven from her home by burglarious intruders, cruelly beaten, and brutally raped. A doctor testified that she was incompetent during her hospitalization for the injuries sustained in the attack and she was shortly thereafter committed to a mental institution.

The state trial transcript reflects evidence abundantly supporting the guilty verdict. L. V. Summers testified that he accompanied the defendants to the solitary home and remained there for part of the housebreaking activities, but abandoned the enterprise before the rape was committed, waiting a short distance away for his companions. He further testified that when Shuler and Chatman rejoined him in about half an hour they said "they had to kill her" but they got "it". Obviously, the victim of the attack was either unconscious or so comatose that the assailants thought they had, in fact, killed her. She managed to walk, however, to a neighbor's home, about half a mile away, where she collapsed in a pool of blood, and the officers were called. Upon her arrival at the hospital she was promptly examined by a doctor, who told the jury that her sexual organs were severely torn, that she was bleeding from that region, and that he found live male sperm therein. Moreover, her skull had been laid bare by a stroke from some blunt object, ribs were broken, and teeth had penetrated the cheeks. There was much other proof, including the confessions of the defendants which are not at issue in this appeal. The defendants offered no testimony. Defense counsel made no argument for a verdict of not guilty but offered an eloquent plea for mercy, that is, that the jury should not assess the death penalty.[1]

---

1. The verdict of the jury was for the death penalty. This, however, has been abrogated by the decision of the Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The convictions were affirmed on direct appeal by the Supreme Court of Florida, 132 So.2d 7 (1961). The Court held that the evidence had established the corpus delicti and that the confessions were voluntarily made.[2] These were the only issues decided.

On September 25, 1962, represented by counsel, the convicts filed a new petition for habeas corpus relief, which the Supreme Court of Florida ultimately rejected, Shuler and Chatman v. State, 161 So.2d 3 (1964), of which more will be said later in this opinion.

On May 28, 1964, still represented by counsel, Shuler and Chatman filed a petition for federal habeas corpus relief. It was this petition which resulted, approximately eight years later (May 4, 1972), in the judgment now presented for review.

By agreement of the parties, the District Court rendered its decision solely on the state court records.

The issues will be considered and decided in the order of their decision below. In so doing, we are governed by the provisions of 28 U.S.C., § 2254(d) which provides that a determination after a hearing on the merits of a factual issue, made by a state court of competent jurisdiction, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct. Under this statute the burden was on the petitioners to establish by *convincing* evidence that the state court determination was erroneous, LaVallee v. Rose, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973).

## I

Were the Petitioners Convicted in Violation of the Due Process Clause of the Fourteenth Amendment through the State's Knowing and Deliberate use of Faked Plaster Foot Casts as Evidence?

This allegation caused the Supreme Court of Florida to appoint retired State Circuit Judge, L. L. Parks, as a Special Commissioner to try the facts, make findings of fact, and report. At the close of a two day hearing, and after argument of counsel, the Commissioner stated verbally that the allegations with reference to faking the plaster casts of the footprint impressions at the scene of the crime had not been proved, *that he did not believe the testimony offered on behalf of the petitioners, and that he did believe the testimony offered on behalf of the State.*[3] He told counsel for the petitioners, "I think you made out a good case on paper but you did'nt make it when it came to the testimony".

Subsequently, the Commissioner filed his written report with the Supreme Court of Florida, which we do not repeat here since it is set forth in full, Shuler v. State, 161 So.2d 3 (Fla., 1964).

The Supreme Court of Florida approved the report, held that the petitioners had failed to carry their burden, that the record evidence was ample to sustain the findings of fact and conclusions drawn by the Commissioner, and dismissed the petition for the writ of habeas corpus.

The District Court discussed at length, 341 F.Supp. 1067–1070, the evidence offered on behalf of the petition-

---

2. About a year after the decision of the Florida Supreme Court, Shuler and Chatman each filed *pro se* handwritten petitions for habeas corpus relief, alleging that the confessions were involuntary. Both petitions were denied without opinion, Shuler v. Cochran, 146 So.2d 380 (Fla., 1962) ; Chatman v. Cochran, 146 So.2d 380 (Fla., 1962). The voluntariness of the confessions was an issue raised by the petition for the writ of habeas corpus in the

federal district court. It was not decided there, apparently on the theory that the issues herein treated necessitated relief without reaching the matter of the confessions. Our decision does not turn on anything contained in the confessions. Since the District Court decided nothing with reference to them we have deliberately refrained from reading them.

3. Appendix, 691.

ers to support their contention that the footprint casts were faked, but neither mentions nor analyzes the proof offered on behalf of the State, in negation of the alleged fakery. The District Court opinion accepts altogether the testimony which the trial Commissioner expressly declined to believe; it ignores the testimony which the Commissioner specifically stated that *he did believe.*

Remembering that the petitioners had the burden of establishing by *convincing* evidence that the state court decisions were erroneous, LaVallee v. Rose, *supra,* we now proceed to a consideration of that question.

Some months after these petitioners had been tried and convicted, two former Lake County deputy sheriffs, Thomas Ledford and Noel Griffin, who had been fired from their positions, made the public accusation that the plaster of paris footprint casts introduced at the original state court trial had been fraudulently manufactured by deputy sheriff L. G. Clark in his own back yard. The District Court opinion does not mention that neither Ledford nor Griffin claimed to have seen this done but asserted only that Clark had told them he did it. At the Commissioner's hearing, Ledford, who had testified at the trial of the defendants, was again a witness. He swore that there were only three partial footprints at the crime scene when he and Griffin arrived, that it had rained that night, which would have substantially erased any footprints except the three which he had covered with pots and pans. He further testified before the Commissioner that what he covered "was a definite heel print", "a kind of a half track", and "a partial print, just a toe print from about the arch of the foot on out". This was inconsistent with the testimony given at the trial of the defendants, in which Ledford told of covering the tracks with pots and pans, making no mention of their quality.

The former deputy, Griffin, likewise testified at the Commissioner's hearing that there were only three partial footprints at the crime scene when he and Ledford arrived, that it rained after the prints were covered, that the victim had chickens which would have destroyed any other prints, and that the deep sand around the house would not admit of perfect prints. Therefore, Griffin testified that the footprint casts introduced at the trial could not have possibly been made at the crime scene.

Also, at the hearing before the Commissioner, two special agents of the F.B.I. gave it *as their opinion* that for various reasons, set forth in the opinion of the District Court, the plaster of paris foot casts could not have been made at the crime scene or did not fit the shoes of the defendants.

The opinion of the District Court, granting habeas relief, 341 F.Supp. 1067–1070, sets forth all of the above testimony and accepts it at face value as if it had not been contradicted.

There was no discussion of the testimony offered before the Commissioner on behalf of the State on which the Commissioner based his rejection of the testimony for the petitioners and his acceptance of the testimony for the State. Under the procedure prescribed by *LaVallee* we must analyze that evidence.

Assistant State's Attorney John W. McCormick[4] testified that he was in court at Brooksville, Florida, when notified of the attack on Charlotte Wass. A highway patrol car conveyed him from Brooksville to Okahumpka, where he was picked up by *deputy sheriff Thomas Ledford.* He definitely recalled being told by Mr. Ledford that there were numerous footprints at the scene. When Attorney McCormick arrived at the scene, "there were tracks underneath the windows, * * * and then tracks leading from the window going out and turning, * * * and one track dug in like this". That same day Mr. McCormick saw the casts made of those tracks and was informed at that time that the shoes worn by the defendants

4. Id., 567.

when arrested did not fit the casts. He advised the officers to attempt to locate shoes which might have been discarded after the commission of the offense. He was at the jail when some of those shoes were brought in after one of the defendants told the officers where to look for them. Some of the shoes were found that night and the others the next morning.

Lake County deputy Joseph Harry Spence [5] was one of the officers who picked up Miss Wass at the home to which she had fled and drove down by her house on the way to the hospital: "I saw all these tracks and the screen door at the east side of the house was torn off and lying on the ground and the front door, a half-glass door, the glass was broken out". So, he sent Miss Wass to the hospital by another officer and remained at the scene the remainder of the night and all the next day to see that the footprints were not disturbed by visitors. There was sand all around the house. There were several tracks around the windows, at the front door, and at the back door, and there were "plenty of tracks all around the house". He saw deputy Ledford cover several tracks with pots and pans, at least four or five of them.

He was present when Mr. Clark and Mr. Yates poured the tracks, at least six sets of them, on Friday morning. The weather was threatening, but it wasn't raining.

Willis V. McCall,[6] who had been Sheriff of Lake County since 1946, testified that he arrived at the scene of the crime sometime between 7 and 8 o'clock of the morning immediately following its occurrence, that the weather was cloudy but it certainly had not been raining prior to the time the casts were taken of the footprints. There were plenty of footprints around the Wass house, some of them obviously made by people run-

ning away from the house, "You could tell where they walked all over the yard", that there were several good tracks which had not been covered. Sheriff McCall further testified before the Commissioner that he saw the casts of the footprints being poured, some had been covered by cans while others had been covered by boxes obtained at a nearby labor camp. He further testified that these casts did not fit the shoes which the defendants were wearing when taken into custody. The officers were told, however, by Levi Summers (the companion of Shuler and Chatman on the night of the offense) that the men had thrown their shoes away near the clay pit. Searches of the area produced the shoes and when found they matched the plaster casts.

Lake County deputy Sewell [7] testified that there were plenty of tracks around the house, as did Lake County deputy Collis M. Godwin,[8] who arrived at the scene about 2 o'clock on the afternoon of March 11. Mr. Godwin saw many footprints around the house and on a path leading away from the house. When they were dry, he helped pick up some of the plaster casts of the footprints and carried them to the courthouse, where they were turned over to the ID room.

Thomas E. Hanson,[9] a citrus grower, who kept a daily record of rainfall taken from a gauge on the lake about three miles from the scene testified that there was no rain at his location between March 3 and March 12. There was $\frac{1}{10}$ of an inch of rain on March 12, followed by heavy rains on March 15, March 16, and March 17, the total for the three days being 11.3 inches.

Since deputy Spence [10] remained at the house the remainder of Friday night and all of Saturday and allowed no interference with the tracks left at the scene by intruders, the testimony of this preponderant number of witnesses,

5. Id., 583.

6. Id., 544, 558.

7. Id., 642.

8. Id., 649.

9. Id., 659.

10. Id., 598.

whose testimony he believed, justified the Commissioner in concluding that both Ledford and Griffin had testified falsely when they claimed that there were only three partial footprints at the scene and that no plaster casts of footprints could have been obtained there.

This, however, does not end the matter.

Deputy Spence saw the plaster of paris poured in the tracks. Since there was no water at the house he had to go down to the lake with a bucket to get the water with which to mix the material to pour in the tracks. Interestingly enough, deputy Spence, who gave clear and positive testimony, had not been informed that he was to be a witness in the hearing before the Commissioner until he was sent for just a few minutes before he took the witness stand.

Dputy sheriff Douglas Sewell,[11] who had been serving in that capacity since 1949, arrived at the rape scene about 9 o'clock on the morning of March 11. When he got there, Mr. Spence and Mr. Yates were making plaster of paris cast footprints; "there were tracks all around the place; all around the house there was good tracks". That same afternoon, about dark, he saw the casts in the ID room at the courthouse. It was not raining when he was at the Wass place, he was one of those who went to look for the discarded shoes and found some of them on the Montclair and Fruitland Road near the clay pits. He was present when the newly found shoes were compared to the cast impressions and the one he was handling "fit".

James L. Yates,[12] had been chief criminal deputy for Lake County since 1947.

He was a graduate of F.B.I. schools and was experienced in ceramics and casts. He testified that about 8 o'clock on Friday morning, March 11, he arrived at the scene: "Mr. Spence had some tracks covered up there and I poured those tracks. He showed me, and found another track out on the road—a track from the house out to the dirt road out there, and I poured that one". He poured six tracks in all.

L. V. Summers,[13] who had testified against the defendants at the trial on the merits, testified in the hearing before the Commissioner. He admitted that he was at the Wass house but repeated that he did not have anything to do with the rape, that the next day after the alleged rape he saw the footprint casts in the custody of Lake County officials, he was asked about the shoes that were worn at the crime, and told the officials that the shoes had been thrown away out on the Montclair Road. When the shoes were brought in, he identified those belonging to him.

■ In the face of this abundance of proof, accepted by the Commissioner, who saw the witnesses and heard them testify, we are compelled to hold that the rejection of the findings of the Commissioner, approved by the Supreme Court of Florida, as to the alleged faking of the footprints failed to comply with 28 U.S.C., § 2254(d).[14]

Another aspect of the alleged faking of the footprint casts was Ledford's testimony that at a pretrial conference of the witnesses, State Attorney Gordon G. Oldham, Jr., instructed the witnesses that they "were not to mention rain in any part, portion, or any way during

---

11. Id., 633.

12. Id., 108.

13. Id., 627.

14. Deputy L. G. Clark, accused of the faking, did not testify. After considerable newspaper publicity by one of the daily papers in the area, a grand jury had indicted him for faking the prints. The indictment was pending at the time of the Commissioner's hearing.

Both the petitioners and the State attempted to adduce Clark as a witness. He was present, but his counsel, Chester Bedell, Esq., objected under the Florida Bill of Rights prohibiting forced possible self incrimination. The indictment was later dismissed under the state statute of limitations. The Commissioner reported to the Supreme Court of Florida, however, that he did take into consideration an affidavit filed with that Court by Clark, before he was indicted, in which he categorically denied faking the prints.

this trial, because if we did it would mess things up", opinion of the District Court, 341 F.Supp. at 1068.

Ledford's testimony in this regard was overwhelmingly refuted by the testimony of others present at the conference, including Oldham himself.

Before the Commissioner, Oldham testified that neither deputies Griffin or Ledford made any remarks about rain at the witness conference and he "absolutely" did not at any time during that conference instruct any witness not to mention rain.[15]

This testimony was fully supported by the testimony of Sheriff McCall,[16] Lake County deputy Joseph Harry Spence,[17] deputy Sewell,[18] and Lester W. Thompson,[19] of Tallahassee, an employee of the Florida sheriff's bureau. Additionally, a private citizen, Leon B. Smith,[20] who lived about a mile from Fruitland Park, a witness, was at the pre-trial conference and heard no such remarks as those attributed to Mr. Oldham. The District Court opinion makes no mention of this testimony. Since the Commissioner rejected the testimony offered on behalf of the petitioners and accepted that on behalf of the State, the evidence clears Mr. Oldham of any reflection on his professional integrity.

## II

Did the Failure to Voluntarily Furnish the Defense with a Copy of the Wass Statement of March 11, 1960 Violate the Due Process Clause?

At 1:30 o'clock on the afternoon following the attack on Miss Wass, Assistant State's Attorney McCormick attempted to take a statement from her at the hospital. We are at a loss to understand why he placed her under oath and had the questions and answers taken down by a court reporter. The statement reveals no indicia of a dying declaration and thus could not have been used at trial even if Miss Wass had died. It consumes twenty-one pages of the Appendix [346–367].

The defense made no request for the statement and was not furnished a copy of it. The failure to supply it voluntarily is the second ground upon which the District Court granted habeas relief to both Shuler and Chatman.

The case against them was tried beginning July 5, 1960. The Supreme Court decided Brady v. Maryland on May 13, 1963, almost three years later.[21]

Although the prosecutor is not to be charged with a gift of prophecy which should have given him advance notice of the *Brady* decision, and although we are aware of no case holding in so many words that *Brady* is to be given retrospective effect, we shall decide this matter as if the case had been decided prior to the trial in 1960.[22]

We now discuss the statement from a factual standpoint, to be followed by a consideration of the applicable law.

First, it is to be remembered that when Miss Wass made the Friday afternoon hospital statement she was in a badly bruised, battered, lacerated, befuddled condition, only about twelve hours subsequent to the receipt of her injuries.

As already recited, Dr. George Engelhard examined Miss Wass upon her arrival at the hospital, treated her thereafter, and signed the papers for her commitment by the county court to a mental

---

15. Appendix, 620.

16. Id., 548.

17. Id., 595.

18. Id., 641.

19. Id., 604.

20. Id., 647.

21. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

22. Since the principle explicated in *Brady* goes to the integrity to the fact finding process and was foreshadowed by the decision in Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1934), we feel that if the statement was "favorable" or "Useful" or "exculpatory", to use the words variously appearing in the numerous decisions in this field since 1962, then the prosecutor was bound by the principle even though he could not be charged with anticipation of the case.

institution. He testified at the original trial that she was incompetent.[23] The record does not reveal how long she stayed at the mental hospital, but she was still there at the time of the trial.

Attorney McCormick testified before the Commissioner[24] that he had a hard time questioning her because she was "so beaten and befuddled, she was incoherent".

Lester Thompson, the previously mentioned employee of the Florida sheriff's bureau, testified[25] that he saw Miss Wass at the hospital in Leesburg on Saturday afternoon, March 12. He attempted to interview her, and "she was rather vague—she really did not know too much what had occurred, except she remembered some individuals being at her home. She just didn't know".

We have personally examined the twenty-one page question and answer statement, as transcribed by the court reporter. It is highly rambling, hazy, and disjointed. It did assert that two men came to the Wass home and knocked on her doors and windows. She asked who was there. They left and she thought they would not come back. Later, they did return, broke into her house, and ransacked it. At one time she thought she would run them away by throwing a pan of water in their faces. She described her efforts to fight off her assailant or assailants. She thought that when she tried to run out of the house she had been struck with something like a hammer (the evidence at the trial showed that she was struck with a pistol butt with such force that it was broken). Apparently, there was no light in her house, but the moon was shining, and she thought the older of the two "must have been in his forties or close to his fifties", although the record shows that he, Chatman, was 23, while Shuler, the younger of the two, was 20. She thought the younger was "about seventeen".

At one point she said, whether he raped me or not, I don't know, because all I know he just kept strangling me, strangling me, and strangling me". At another point she said, "now, I believe that he raped me, I really do". She said the younger man had not touched her but he had ransacked the house, demanding money.

As described by the examining physician, the physical facts would clearly satisfy a reasonable mind that the woman had been raped. The only question was the identity of the rapist or rapists. The testimony of their companion, L. V. Summer, fixed the identity on Shuler and Chatman, either as principals or as aiders and abettors. He told how they planned the burglary-robbery, how they put on old shoes to disguise their tracks, how they said upon their return to the car that they had to kill her, that they got no money, but they got "it", and how they threw away their shoes on the way home. This was enough to make their guilt a jury issue, without the confessions, the footprint casts, the bloody handkerchiefs, the bloody clothes, or other items in evidence.

At the hearing before the Commissioner, counsel for the petitioners twice argued that the statement was "favorable" or "exculpatory" as to the younger man, Shuler, because it would show that "one of the defendants never touched her".[26] How this statement, emanating from a beaten, befuddled, incompetent woman, would help an aider and abettor, was not demonstrated. Conceivably, if it had not been contradicted by so much other proof, it might have helped avoid the death penalty. That issue, however, is now moot by operation of the decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In any event, counsel never suggested that the statement might have been of any value to the defendant Chatman, and made no such argument in the memoran-

---

23. Appendix, 68.
24. Id., 572.
25. Id., 612.
26. Id., 527, 678.

dum filed with the United States District Court.

With this discussion of the factual circumstances and the contentions of the parties in the state courts, we now turn to the law. We do not have to travel far to find it.

■ At the outset, it must be recognized that this is not a case in which the prosecution deliberately presented a false picture of the facts by (1) knowingly using perjured testimony, since Miss Wass did not testify at the trial, or (2) failing to correct testimony when it became apparent that it was false, or (3) actively suppressing evidence known to be exculpatory after a request to produce it. As to Point 3, appellees argue that they could not have known to request a statement when they were ignorant of its existence, but this is not a valid argument. Had the defense wished to avail itself of the principle later made plain by *Brady*, it could have easily called on the State to present all statements, documents and similar material in its possession exculpatory of either of the defendants. From the facts already stated, it cannot be said that Miss Wass' statement was of such "high value to the defense" that it could not have escaped the attention of the prosecution, United States v. Bonanno, 2 Cir., 1970, 430 F.2d 1060.

Rather, this is clearly a case in which the State passively or negligently failed to offer it voluntarily to the defense, and there is no evidence in this record to support an argument to the contrary.

The most recent Supreme Court case in this field is Moore v. Illinois, 408 U. S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). This was a case in which the identity of a murderer was a disputed crucial issue. The defense had moved for disclosure of all written statements taken by the police from any witness, to which the State agreed. It was later argued that six items of evidence, unknown to the defendant at the time of the trial, were not produced and were, in fact, suppressed by the State. Among

the statements not given the defendant was an F.B.I. report, which the prosecuting attorney asserted he did not recall having seen before or during the trial. Other inconsistencies, based on statements of various witnesses, were alleged to have been withheld. Moore contended that the defense could not be expected to make a request for specific evidence that it did not know was in existence.

The Supreme Court held:

"The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. These are the standards by which the prosecution's conduct in Moore's case is to be measured."

\* \* \* \* \* \*

"We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."

Another Supreme Court case, Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) laid down the following guidelines:

(1) Deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice. The same results obtain, when the State, although not soliciting false evidence, allows it to go uncorrected when it appears;

(2) When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the rule;

(3) The rule however does not automatically require a new trial whenever a combing of prosecutors' files after trial has disclosed evidence possibly useful to

the defense *but not likely to have changed the verdict* (emphasis ours). A new trial is required if false testimony could in any reasonable likelihood have affected the jury.

In United States v. Johnson, 5 Cir., 1974, 487 F.2d 1318, 1325, we have recently held:

"The rule is that presentation of known false evidence, and nondisclosure of evidence affecting credibility, are grounds for retrial if the deception was material, that is if it might 'in any reasonable likelihood have affected the judgment of the jury'." (Citing Giglio v. United States, *supra*)

Last year, in Davis v. Heyd, 5 Cir., 1973, 479 F.2d 446, we stated that the real question is whether the prosecution failed to disclose evidence so material to the guilt or innocence of the accused that *he was denied a fair trial* under the teachings of Brady v. Maryland, 373 U. S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

These cases are in line with what the Tenth Circuit said in United States v. Harris, 10 Cir., 1972, 462 F.2d 1033, 1035:

"In cases involving the deliberate suppression of exculpatory evidence the courts will not inquire into the elusive question of actual prejudice affecting the result of a criminal prosecution. But where, as here, the denied evidence results from what might be termed unintentional and passive (though not excusable) nondisclosure a different test is indicated. The test must be whether the trial was merely imperfect or was unacceptably unfair. As a general rule, a new trial is not necessitated because of newly discovered evidence of a cumulative or impeaching nature unless its potential impact upon the result of the trial is apparent." King v. United States, 10 Cir., 402 F.2d 289; United States v. Gleeson, 10 Cir., 411 F.2d 1091.

In United States v. Teague, 7 Cir., 1971, 445 F.2d 114, 121, it was said:

"The defendant has not shown to us any possible prejudice by the suppression of the evidence. . . . It could, in no way, devalue the strong case the government had proved against him. . . . We do not believe that it would have led the jury to entertain a reasonable doubt of the defendant's guilt."

"Negligent or even intentional failure of the prosecutor to disclose an additional item of impeaching evidence would not invariably require that a verdict be set aside \* \* \*. The test, however, is \* \* \* whether \* \* \* there was a significant chance that this added item, developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction", United States v. Miller, 2 Cir., 1969, 411 F.2d 825, 832; United States v. Bonanno, 2 Cir., 1970, 430 F.2d 1060.

Quite obviously, the defense could not have used this statement in evidence for any purpose but the possible impeachment of Miss Wass if she had taken the witness stand either for the State or as a hostile witness called by the defense. If the statement could have been admitted under any other evidentiary theory, it ordinarily would have been competent as a whole, not in part, including the stranglings and the hammer blows.

Neither side called her, for the obvious reason that she had been committed about three months previously to a mental institution. It is true that a lunatic may be allowed to testify if he is able to apprehend the obligation of an oath and give a correct account of matters he has seen or heard, District of Columbia v. Arms, 107 U.S. 519, 2 S.Ct. 840, 27 L.Ed. 618; Lockard v. Parker, 4 Cir., 1948, 164 F.2d 804; Henderson v. United States, 6 Cir., 1955, 218 F.2d 14, 50 A.L.R.2d 754, cert. denied 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253.

If a patient in a mental institution is offered as a witness, the opposing party has a right to challenge his

competency, whereupon it becomes the duty of the Court to make such examination as will satisfy it of the competency or incompetency of the proposed witness. While the form of the examination rests in the sound discretion of the Court, it is the better practice for the trial judge either to question the witness himself or to be present when the examination is conducted by counsel, and to rule on the basis of the evidence heard. Of course, the trial judge is not limited to an examination of the witness alone, but, in its discretion, may hear evidence from doctors, acquaintances, or other sources calculated to lead to a correct appraisal of the competency of the witness. The findings of the trial court may not be rejected on review except for an abuse of discretion, Henderson v. United States, *supra*; Florida Power and Light Company v. Robinson, 68 So. 2d 406 (Fla., 1953).

Therefore, either the State or the defendants could have called Miss Wass as a witness in this case, and whether she would have been allowed to take the stand could have been determined by the foregoing principles.

■ Both the State and the defense had the option of attempting to qualify Miss Wass, but neither had the obligation to do so. The State, as the record reveals, was able to prove its case without her. It did not have to take the chance of reversing a conviction through the use of a mentally ill person, whose conduct and behavior on the witness stand might be highly unpredictable and thus turn out to be highly prejudicial.

It appears most reasonable that Miss Wass, if her competency could have been established, would have been the last person the defense wished to see at the courthouse. She was the only eye-witness. Her testimony would have lifted the proof from circumstantial to direct. The personal presence of the rape victim would have been far more injurious to Shuler and Chatman than her absence.

■ Thus, the defense quite wisely chose to make no effort to call her. We think this disposes of any argument that if the defense had known of her state-

ment it might have sought to call her, United States v. Bonanno, 2 Cir., 1970, 430 F.2d 1060. Thus, the failure to present the statement cannot reasonably be said to have prejudiced the defendant's preparation for trial. The defense is bound to have known, as a matter of common sense, that the State had talked to the victim and had taken statements, oral, written, or both. Yet, it did not ask for their production.

■ The Confrontation Clause of the Sixth Amendment applies to evidence actually disclosed at trial and a defendant has no right to confront a "witness" who provides no evidence at the trial, United States v. State of New York, 2 Cir., 1970, 426 F.2d 1176, 1184, and the cases there cited.

In this state of the record, there is no substantial basis for a conviction that the petitioners met the burden of showing that the negligent or passive failure of the State to produce the Wass statement amounted to a denial of due process. It might not well have been determinative of guilt or innocence, Giglio v. United States, *supra*; there appears no reasonable likelihood that it would have affected the judgment of the jury, United States v. Johnson, *supra*; it cannot reasonably be said that it denied the defendants a fair trial under the teachings of Davis v. Heyd, *supra*; its potential impact upon the result of the trial is not apparent, United States v. Harris, *supra*; it could not in any way have devalued the strong case proved by the State, United States v. Teague, *supra*; and its absence in no way foreclosed the calling of Miss Wass as a witness, had the defense chosen to attempt it. United States v. Bonanno, *supra*. This situation did not involve a witness about whom the defense knew nothing.

It necessarily follows that the District Court should not have awarded habeas corpus relief for failure to furnish the defense with a copy of the statement.

### III

### The Illegal Searches and Seizures

The opinion of the District Court on this subject, 341 F.Supp. at 1072, opens

with the statement, "It is undisputed and uncontradicted by the parties and this Court therefore finds that petitioner Robert Shuler was a paying tenant with Levi Summers in a room in the home of his grandfather and landlord, L. C. Clarett [spelled Cleary in the transcript of the state court trial]."

We have combed the record with total thoroughness and we are unable to find any place in which the petition for the writ of habeas corpus alleged, or the testimony stated, that Shuler was a paying tenant in the home of his grandfather.

Be that as it may, the record is likewise bereft of any indication that any state court has held a hearing or made findings of fact from the state court record on any of the following subjects: (1) whether or not Shuler was a paying tenant; (2) whether the consent of L. C. Cleary for the search of his home, occupied by his grandson, Shuler, was freely and voluntarily given; and (3) whether there was ever any search conducted at the home of Jerry Chatman, the convicted co-defendant. Although counsel for the defendants objected strenuously at the state court trial as to the involuntary character of the defendants' confession, as to which there was an extended hearing before the trial judge outside the presence of the jury, and although the admission of articles taken from Cleary's home and allegedly given to the officer by Chatman's wife were objected to as irrelevant, there was no objection as to either the Shuler or Chatman articles on unreasonable search and seizure grounds. It is true that the Supreme Court of Florida, in the memorandum decision above alluded to, rejected Shuler and Chatman's *pro se* search and seizure habeas petitions. These petitions, however, were couched in conclusory terms only, with no allegation of the facts. We are bound to conclude that, although the parties stipulated otherwise in the United States District Court, there has never been a state court disposition and no exhaustion of state court remedies as to the legality of the acquisition of this particular evidence against Shuler and Chatman.

■ We conclude therefore that that part of the judgment of the District Court which invalidated the acquisition of this evidence as having been the product of unlawful searches and seizures must be vacated and remanded to the District Court, in order that these issues may, in turn, be remanded to the state courts for an appropriate exhaustion of state remedies. This will be done in keeping with the teachings of the Supreme Court in the recent cases of Schneckcloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and United States v. Matlock, —— U.S. ——, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

For the benefit of the record, with reference to the seizure of the articles at the home of L. C. Cleary, we note that the present record[27] contains the testimony of Lake County deputy Joseph Harry Spence, who testified as follows:

"When we returned there, L. C. Cleary was out in the yard and he met us and Deputy Yates explained to him what we were there for, and he told us to come on in, and we were looking around in Robert and Levi's room and under Robert Shuler's bed I found a pair of shorts with blood all over the fly of the shorts."

At pages 108–111, 113 of the Appendix, is found the testimony of James L. Yates, chief criminal deputy of Lake County since 1947, who testified that right after he had poured the track at the Wass residence he found a place in the yard, torn up by scuffling, and there were two bloodstained handkerchiefs together on the ground. One was a monogrammed handkerchief and one was a plain handkerchief. He then went over to L. C. Cleary's house, the grandfather of Robert Shuler,

"And there I asked him could I go in the house and look at any shoes or

27. Id., 87.

clothes that either Robert Shuler or Levi Summer had there, and he said yes, and I went in there with L. C. Cleary and found five monogrammed handkerchiefs that matched the one I found over there at the Wass house."

The monogrammed handkerchief found at L. C. Cleary's had the same initials and the same pattern as the bloodstained handkerchief found at the scene where the scuffle took place. When the bloodstained handkerchief and the handkerchief found at Cleary's were admitted into evidence, the defense stated that it had "no objection".

With reference to certain articles introduced in evidence against Jerry Chatman, Joseph Harry Spence, Lake County deputy, testified: [28]

"I went back Saturday morning to his home [Jerry Chatman's] and his wife, Daisy, gave me the clothes that Jerry was wearing on Thursday night, the night of this attack up at Miss Wass's and also a pistol that Jerry was supposed to have had. Jerry had told the sheriff that he had the gun and where it was in Leesburg at his home, and Daisy got the gun and his clothes and gave them to me, and Mr. Godwin was with me at the time."

\* \* \* \* \* \*

"This is a pair of shorts of Jerry's —Jerry Chatman's—and his wife gave me these shorts and a pair of khaki pants at his home."

As to Chatman's shoes, chief deputy James Clark testified that "I went to Jerry's house and asked his wife for them and she went in the house and got them and brought them out and gave them to me".[29]

■ It is not our function to make findings of fact; therefore, the state courts must first perform this function.

As to the issues concerning the footprint casts and the failure to furnish a copy of the Wass statement of March 11, 1960, the judgment of the District Court is reversed. As to the acquisition of the evidentiary items from the homes occupied by the petitioners, the judgment of the District Court is vacated and remanded for further proceedings not inconsistent herewith.