Gregory WHITE, Petitioner-Appellee,

v.

Ross MAGGIO, Warden, Louisiana State Penitentiary, Respondent-Appellant.

No. 76–2012.

United States Court of Appeals,
Fifth Circuit.

Aug. 8, 1977.

Rehearing Denied Aug. 31, 1977.

---

William L. Brockman, Asst. Dist. Atty., Harry F. Connick, Dist. Atty., New Orleans, La., for respondent-appellant.

Patricia Saik, New Orleans, La. (Court-appointed), for petitioner-appellee.

Before WISDOM, CLARK and RONEY, Circuit Judges.

WISDOM, Circuit Judge.

The appellant, Ross Maggio, Acting Warden of the Louisiana State Penitentiary, urges reversal of the grant of a writ of habeas corpus. The district court issued the writ because the State refused to produce certain tangible evidence for pretrial inspection by the defense, as required by the due process clause on the strength of *Barnard v. Henderson*, 5 Cir. 1975, 514 F.2d 744. The district court granted the writ to Gregory White, who was convicted of second degree murder by a Louisiana state court in 1974. On appeal the State argues that the district court incorrectly applied *Barnard* to the facts of this case. Because correct application of *Barnard* requires additional fact-finding, we remand the case for further proceedings.

## I.

Gregory White allegedly murdered Willie Green on March 24, 1974, a short time after the men had argued over Green's association with Debra Williams, a former friend of White. The undisputed evidence showed that White and a friend, Calvin Adams, came to Green's apartment on Toledo Street in New Orleans on the night of the murder and asked Williams to leave the premises. She refused, and an argument ensued between Green and White in the hallway outside the apartment. Green objected to White's brandishing a gun. White then fired three shots from the gun into the door of the apartment, but no one was injured.

After White and Adams departed, Green and Norwood Jackson, a friend who had been in the apartment during the argument and shooting, went to two bars. Jackson

testified that they stayed in each only a few minutes, because the shooting had upset them. As they left the second bar, at the corner of Second and Danneel Streets, Jackson said, an automobile driven by Adams with White as a passenger stopped at the intersection. Jackson testified that as he walked out of the bar he saw White shake his head and point a gun at Green from the car. Two shots were fired. Jackson ducked. After the car sped away, he found Green on the sidewalk with a bullet hole in his forehead.

Jackson sent word of the second shooting to Williams. She called the police and led them to White's apartment. White's wife met the officers at the door and consented to a search of the premises. The police found White and a box of 38–40 magnum shells in a closet. After they placed him under arrest and notified him of his *Miranda* rights, he reportedly blurted out, "I threw the gun in the river". The police testified that they asked no questions.

Because the police did not produce the gun at trial, the only tangible evidence connecting White to the murder was the 38–40 pellet that struck Green in the head. The pathologist who performed an autopsy on the body retrieved the bullet and testified that it caused Green's death. Detective Robert Townsend, the senior examiner in the Firearms Identification Unit of the New Orleans Police Crime Laboratory, then told the jury that the 38–40 pellet bore the same markings as a 38–40 pellet that White had fired through the door of Green's apartment. Townsend concluded that the two bullets were fired from the same gun. He stated that no other expert could disagree with this conclusion.

The defense could not challenge Townsend's testimony by offering its own expert, because the trial court had denied two pretrial requests for access to the pellets. The defense counsel did not renew the request at trial and offered no testimony about the theoretical possibility of disagreement among experts regarding bullet comparisons. Rather than producing other evidence, the defense rested on the legal presumption of White's innocence.

On appeal of the conviction to the Louisiana Supreme Court, White argued that the refusal to permit his examination of the bullets denied him a fair trial and due process of law. That Court, in a divided opinion, *State v. White*, La.1975, 321 So.2d 491, affirmed the conviction, though the trial court had based its refusal to permit discovery on *State v. Barnard*, La.1973, 287 So.2d 770, the case in which this Court later set aside Barnard's conviction in *Barnard v. Henderson*.[1]

The district court granted White's petition for a writ of habeas corpus on the recommendation of a magistrate who reviewed the trial court record but did not conduct a hearing on the petition. The magistrate concluded, "whether or not the bullets were introduced into evidence by the State, it was error to deny White's motion to examine them and afford him the opportunity to present evidence that may have been favorable to him".

## II.

■ This Court granted a writ of habeas corpus to a Louisiana prisoner in *Barnard v. Henderson*, because the State's refusal to permit the defense to examine tangible evidence before trial violated fundamental fairness. Barnard was convicted of mur-

---

1. The Louisiana Supreme Court distinguished *Barnard* from the facts of this case on three bases, none of which we find persuasive. First, the fact that White did not request examination of the bullets at trial does not distinguish the case from *Barnard*, in which the defendant also submitted only a pretrial request for inspection. Second, the Court argued that the bullets were badly damaged in *Barnard* but were intact in *White*, facilitating identification in the latter case. This difference does not answer the crit-

ical question posed by *Barnard*: whether conclusion of the State's ballistics expert was subject to disagreement. Third, the Louisiana Court thought that the case against White was stronger than the case against Barnard, because Jackson had witnessed the shooting by White. Again, however, this factual difference does not respond sufficiently to the applicable question posed by *Barnard* about whether the bullets were "critical". *See* part III of this opinion.

dering Rex Emile Lanier on the morning after the men had argued about the ownership of Lanier's automobile. A witness to the argument heard Barnard threaten to kill Lanier, but no one witnessed the murder. Before trial the defense moved for inspection of a gun that had been traced to Barnard's possession and of the bullet that killed Lanier. The trial court refused, holding that in Louisiana pre-trial discovery in criminal cases was limited to the defendant's confessions and narcotics. The gun and bullet did not qualify for discovery under *Brady v. Maryland*, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, according to the Louisiana Supreme Court, because the defense did not prove that the evidence would have been favorable to Barnard. This Court concluded, however, that the state had deprived Barnard of due process of law by denying him the means necessary to conduct his defense:

> [F]undamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion.

514 F.2d at 746.

*Barnard* was not announced until after the conviction of White in the Louisiana trial court. Whether this rule of due process should apply here presents the question whether *Barnard* applies retroactively.[2]

The criteria controlling resolution of the question include the purpose to be served by the new standard, the extent of reliance by law enforcement authorities on the old standard, and the effect on the administration of justice of a retroactive application of the new standard. *Michigan v. Payne*, 1973, 412 U.S. 47, 51, 93 S.Ct. 1966, 36 L.Ed.2d 736; *Stovall v. Denno*, 1967, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199; see *Linkletter v. Walker*, 1965, 381 U.S. 618, 636, 85 S.Ct. 1731, 14 L.Ed.2d 601. Generally, retroactive application of law-changing decisions is recognized when the purpose of the change is "to correct serious flaws in the fact-finding process at trial". *Stovall v. Denno*, 1967, 388 U.S. 293, 298, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199; *Blackburn v. Cross*, 5 Cir. 1975, 510 F.2d 1014, 1018, *rehearing denied*, 517 F.2d 464; *see, e. g., Roberts v. Russell*, 1968, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100, *rehearing denied*, 393 U.S. 899, 89 S.Ct. 73, 21 L.Ed.2d 191; *Jackson v. Denno*, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908.[3] Consideration of the purpose of the rule dominates the application of the three-pronged test. *Desist v. United States*, 1969, 394 U.S. 244, 249, 89 S.Ct. 1030, 22 L.Ed.2d 248, *quoted in Blackburn v. Cross*, 5 Cir. 1975, 510 F.2d 1014, 1018. The two other factors of the test have substantial influence only when the purpose of the new rule does not clearly favor either retroactivity or prospectivity. 394 U.S. at 251, 89 S.Ct. 1030; 510 F.2d at 1018.

In this case the new procedural rule clearly favors retroactivity because it protects the accuracy of the fact-finding proc-

**2.** The fact that the new rule of criminal procedure arose in *Barnard* under the due process clause does not obviate the need to decide whether it applies retroactively. *See Jackson v. Denno*, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; *cited in Roberts v. Russell*, 1968, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100.

**3.** *Roberts* retroactively applied *Bruton v. United States*, 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. *Bruton* had held that admission at a joint trial of a defendant's extrajudicial confession implicating a co-defendant violated the co-defendant's sixth amendment right of cross-examination. *Roberts* applied the holding retroactively because such an error "went to the basis of fair hearing and trial" and " 'because the procedural apparatus never assured

the [petitioner] a fair determination' of his guilt or innocence". 392 U.S. at 294, 88 S.Ct. at 1922, *quoting Linkletter v. Walker*, 1965, 381 U.S. 618, 639, 85 S.Ct. 1731, 14 L.Ed.2d 601. *Jackson* held that the criminal defendant did not enjoy adequate procedures to ensure a reliable determination of the voluntariness his confession as required by the fifth and fourteenth amendments and *Rogers v. Richmond*, 1961, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. Similar to the retroactive application of the right of indigents to appointed counsel in *Gideon v. Wainwright*, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, there is no analysis of the question of retroactivity in *Jackson*.

ess at trial. As Justice Barham explained in his dissent to the Louisiana Supreme Court decision in *State v. Barnard*, La.1973, 287 So.2d 770, 778, "the only means by which the defendant can defend against expert testimony by the State is to offer expert testimony of his own". By denying White access to the bullets, the State deprived him of any opportunity to test the validity of the conclusion of the prosecution's ballistics expert. Perhaps the denial prevented him from discovering important exculpatory evidence. Effective confrontation and cross-examination of the expert was denied. And the jury received solely the State's interpretation of the only tangible evidence that connected the defendant to the murder. These are serious flaws in the fact-finding process—flaws the procedural rule of *Barnard* would correct. Consequently, the purpose of the new rule strongly favors its retroactive application.

The reliance of state authorities on restricted discovery and the effect of retroactive application of *Barnard* on the administration of justice do not persuasively support prospective application of the case. First, even though Louisiana has consistently limited discovery in criminal cases,[4] its criminal justice system does not appear to rely heavily on the restriction. For example, exceptions to the rule are granted regarding confessions of defendants. *State v. Barnard*, La.1973, 287 So.2d 770; *State v. Hall*, 1969, 253 La. 425, 218 So.2d 320; *State v. Dorsey*, 1945, 207 La. 928, 22 So.2d 273. In drug cases the defense may inspect seized narcotics, which are more subject to destruction or adulteration during inspection and testing than are guns or bullets. *See, e. g., State v. Migliore*, 1970, 261 La. 722, 260 So.2d 682. Most importantly, as explained in *State v. Collins*, La.1975, 308 So.2d 263, 264:

> [w]hen proper allegations support a finding that the defendant acted in self defense and specifies that the weapon used

by the alleged victim against the defendant, supporting a claim of self-defense, we have required production of the weapon by the State. *State v. Woodruff*, 281 So.2d 95 (La.1973).

Thus, the State's reliance on the denial of inspection of critical tangible evidence by defendants does not militate forcefully for prospective application of *Barnard.*

Second, the case for prospectivity is not enhanced by the effect retroactive application will have on the State's administration of justice. Retrials will not be required in every case in which the defendant was denied access to tangible evidence. Reversals of convictions will occur only when the denials of access violate fundamental fairness. Defendants must demonstrate that the evidence was both "critical" to their convictions and subject to varying expert opinion. The remedial process that is explained below[5] will guarantee that retrials occur only when both essentials of the *Barnard* test are met. Consequently, the impact that *Barnard* may have on the administration of justice does not outweigh the need to effect the purpose of *Barnard* retroactively.

### III.

Under *Barnard* a writ of habeas corpus should issue only if the state prevented inspection by defense experts of tangible evidence that is both "critical" to the conviction and subject to varying expert opinion. In this case the first of these two requirements is met; the evidence is critical to the conviction. Without a hearing in some court, in the state court or in the district court, however, we cannot determine whether the bullet comparison is subject to varying opinion. Consequently, we must remand for further fact-finding on the second issue.

First, regarding the term "critical evidence", the State argues that the 38–40 bullets are not important to the case of

---

4. *See, e.g., State v. Jones*, La.1976, 332 So.2d 466; *State v. Collins*, La.1975, 308 So.2d 263; *State v. Thomas*, La.1975, 306 So.2d 696; and cases cited at *State v. Barnard*, La.1973, 287 So.2d 770, 773.

5. *See* text accompanying and following note 8.

either the prosecution or the defense. Because the prosecution offered other evidence of guilt at trial, including Jackson's eyewitness statement and White's inculpatory comment, the State now attempts to minimize the extent of its reliance on the bullet comparison. The State submits that the evidence was not "critical" to the defense, because a different interpretation of it could not have conclusively established White's innocence.

■ Both arguments misapprehend the meaning of the term, "critical evidence". It is not synonymous with "dispositive"; it does not mean "most important". Instead, it denotes the due process policy that the fourteenth amendment will compel production by the State only of evidence having substantial probative force. In *United States v. Herndon*, 5 Cir. 1976, 536 F.2d 1027, 1029, for instance, we stated this general requirement in terms of materiality. If the State withholds immaterial evidence—evidence without probative force on the issues at trial—the defense would not be impaired and due process would not be denied. The proper definition of the word "critical" must therefore reflect the policies and purpose of the due process clause.

A useful analogy can be drawn to the line of cases following *Brady v. Maryland*, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, which required, as a matter of due process, the production by the prosecution of exculpatory evidence. The Court added in *Brady*, however, that due process required the production only of "material evidence". The Court has recently defined this term:

> [T]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.

*United States v. Agurs*, 1976, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342, 354–55. The *Agurs* test, which applies when the defense has not requested particular exculpatory information, differs from the test that applies when the defense has requested specific evidence. *Cf. id.* at 106–07, 96 S.Ct. at 2399, 49 L.Ed.2d at 351. The due process balance changes when a specific request is made, because the prosecutor is better able to assess materiality when he knows precisely the object of his consideration. If he then fails to turn over exculpatory information, he has deprived the defendant of due process unless "there appears no reasonable likelihood that [the evidence] would have affected the judgment of the jury". *Shuler v. Wainwright*, 5 Cir. 1974, 491 F.2d 1213. Stated in positive terms:

> if there is a significant chance that the withheld evidence, developed by skilled counsel, would have induced a reasonable doubt in the minds of enough jurors to avoid a conviction, then the conviction must be set aside.

427 U.S. at 119, 96 S.Ct. at 2404–05, 49 L.Ed.2d at 358 (Marshall, J., dissenting).[6] The Supreme Court has therefore decided that the Constitution will compel the production of evidence only if it possesses probative force, the strength of which can vary depending on the specificity of the defense request for information.

■ Because the due process policies are similar in *Barnard v. Henderson* and the *Brady* line, similar standards of materiality should apply in both. As in *Brady* and *Agurs*, our concern in *Barnard* was to ensure that the accused had the means necessary to conduct his defense; in short, to demonstrate to the jury that a reasonable doubt existed about his guilt. "Critical evidence", for purposes of the due process clause, is evidence that, when developed by skilled counsel and experts, could induce a

---

6. Justice Marshall would not alter the due process balance with the specificity of the request by the defense for information. His dissent in *Agurs* therefore argues for the application of

the lower standard of materiality, which cases such as *Shuler* had employed, even when the defense makes only a general request for the production of evidence.

reasonable doubt in the minds of enough jurors to avoid a conviction.[7] When the defense makes a specific request for such evidence, the request should be granted. If only a general request is made, the higher standard of materiality announced in *Agurs* applies.

In this case, the defense specifically requested the two bullets. When properly compared by defense experts and counsel, the evidence could reasonably have affected the judgment of the jury on whether a reasonable doubt existed about White's guilt. The bullets were the only tangible evidence connecting White to the murder. With the prosecution's comparison, they provided persuasive evidence of guilt. On the other hand, if defense experts could have testified that the bullets did not match, the case against White would have fallen apart. Besides the comparison, the State relied on the eyewitness account of Jackson and the inculpatory statement of White to secure the conviction. But the probative force of both of these grounds is subject to attack. First, Jackson's ability to identify the assailant in the car is questionable because of the poor light conditions at 3 a. m. This poor lighting was compounded by the fact that the gunman was inside an automobile. In addition, because Jackson ducked when he saw the gun, he could have viewed the assailant for only a brief time. The defense could also argue that his ability to perceive had diminished after visiting two bars. And, given the earlier shooting, Jackson could hardly be considered a disinterested witness. Even if he did not deliberately misidentify the defendant, he could have, in good faith but erroneously, identified White as the murderer because of the previous incident. Second, the inculpatory statement, "I threw the gun in the river" could have referred to the gun used only in the earlier of the two shootings. Because the defendant's former close friend led the police to his door, White could have concluded that his arrest resulted from the altercation at the Toledo Street apartment. An effective challenge, therefore, to the bullet comparison could have raised a reasonable doubt in the minds of the jurors about the guilt of the defendant. The evidence requested by the defense was "critical" under *Barnard v. Henderson.*

■ Second, the district court may issue a writ of habeas corpus under *Barnard* only if it concludes that the specific evidence withheld is subject to varying expert opinion. In this case the magistrate who recommended issuance of the writ did not reach this question. He concluded that the denial of access to the bullets violated due process because White had the right to examine potentially favorable evidence. But the holding of *Barnard* is not so sweeping. That decision seems to hold that only if the evidence is subject to expert disagreement will failure to allow expert examination be the basis for the finding of a reasonable doubt. The district court must decide whether material disagreement could exist before it may properly issue the writ.

The state court record does not contain sufficient information on whether experts would disagree in this case. The State argues it established at trial that ballistics experts never disagree on a bullet match because it "is a direct science". That, however, misses the point. *Barnard* requires an opportunity for the defense to examine the critical bullet evidence. Because the *Barnard* test is stated in terms of the particular evidence requested, the defense should not be limited to abstract discussions of scientific precision. On remand, then, the district court should hold a hearing on the matter. The petitioner will initially bear the burden to prove that the comparison of the bullets by Detective Townsend is sub-

---

7. The second prong of the *Barnard* test responds to another situation in which the State would not violate due process by withholding evidence. If the evidence were not subject to an interpretation contrary to that of the State, then inspection and testing by the defense would be a useless exercise. The fact-finding process at trial could not be altered. The only exception to this principle would occur when the State, knowing the evidence to be exculpatory, planned to refrain from introducing it at trial. The defense could then gain inspection under *Brady.*

ject to disagreement. *See Bellew v. Gunn*, 9 Cir. 1976, 532 F.2d 1288, 1290, *cert. denied*, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1192; *Lokos v. Capps*, 5 Cir. 1976, 528 F.2d 576, 578; *Webster v. Estelle*, 5 Cir. 1974, 505 F.2d 926, 928, *cert. denied*, 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785. Here, the prosecution, by denying access of the defense to the bullets, has made it virtually impossible for the petitioner to carry his burden of proof. The State should produce the bullets for expert inspection by the defense.[8] If the bullets are unavailable, the State may produce the basic physical evidence from which its forensic scientist derived his opinion if such evidence is sufficient to allow an independent scientific comparison. Should the State fail to produce either the bullets or such evidence, then the writ should issue. Should the state produce such bullets or evidence, the writ should issue only if the defense can prove that the comparison of the two bullets is subject to varying opinions by experts. The State will then have a reasonable time to retry the defendant, allowing full opportunity for ballistics experts to testify for each side. If the defense cannot meet its burden of proof, however, the *Barnard* test will not have been met and no deprivation of due process will have been established.

### IV.

The State also argues that the denial of access to the bullets, if erroneous, was harmless error. To promote speedy disposition of the case on remand, we reject this contention now. As the previous discussion has demonstrated, the evidence was critical to the State's case. If the bullet comparison is subject to expert disagreement, then,

the defendant was denied due process. Because of the importance of the evidence, we conclude that such a deprivation could not be harmless beyond a reasonable doubt.

The judgment of the district court is AFFIRMED in part, and REVERSED in part and REMANDED for further proceedings, consistent with this opinion, under the second element of the two-part test of *Barnard v. Henderson*.

---

**8.** During oral argument counsel for the State suggested that it would be appropriate to remand this case to the district court to allow the petitioner an opportunity to have an independent examination of the contested pellets rather than to invalidate the conviction, as was done in *Barnard v. Henderson*, if the Court concluded that a violation of petitioner's due process rights had occurred. In a supplemental brief filed after argument, counsel withdrew the suggestion, citing *Weatherford v. Bursey*, 1977, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 and *State v. Williams*, 1977, 343 So.2d 1026 (La.). We distinguish the language from *Weatherford* quoted in the State's brief as too general to be applicable to the specific facts in this case. We distinguish *Williams* because the Louisiana Supreme Court said that "the defendants conviction was not based on ballistics evidence" and that "the ballistics evidence [was] not crucial to the conviction". Here, on the other hand, the ballistics evidence was "critical"; and we are bound by this Court's decision in *Barnard v. Henderson*.